**Bonita Jean SELF, Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY, a foreign corporation, Defendant.**

**No. 69–490 Civ. T.**

United States District Court,
M. D. Florida,
Tampa Division.

June 9, 1972.

B. J. Masterson, Masterson, Sundberg & Rogers, St. Petersburg, Fla., for plaintiff.

Vernon W. Evans, Jr., Shackleford, Farrior, Stallings & Evans, P. A., Tampa, Fla., for defendant.

## OPINION

JOSEPH P. WILLSON, Senior District Judge (Sitting By Designation).

This diversity action is based on an insurance company's alleged bad faith in failing to settle certain personal injury claims within the limits of an insured's automobile liability insurance policy.

This civil action came on for trial non jury. In a pretrial stipulation counsel agreed on a number of facts essential to the disposition of this case which are as follows [Plf. Ex. 2]:

### "AGREED FACTS"

"1. That the plaintiff, Bonita Jean Self, was involved in an automobile accident in St. Petersburg Beach, Florida, on May 30, 1967, and at that time her policy of insurance with Allstate Insurance Company was in full force and effect with limits of liability in the amount of $10,000.00 with injury to any one person.

"2. That as a result of the accident of May 30, 1967, a lawsuit was filed by Beatrice Kilian and Frederick John Kilian, her husband against Bonita Jean Self, John Christian Acker and Campbell's National Car Leasing, Inc. in the United States District Court for Tampa, Florida, Case No. 68–443 Civil T.

"3. That either prior to or during the trial of the original case 68–443 Civil T. the co-defendants, John Christian Acker and Campbell's National Car Leasing, Inc., entered into an agreement with the plaintiffs, Beatrice Kilian and Frederick John Kilian, limiting their liability, which type of agreement has come to be known as a 'Mary Carter Agreement'.

"4. That Allstate Insurance Company was not aware of said 'Mary Carter Agreement' prior to rendition of verdict upon the trial of that case.

"5. That upon the trial of the aforementioned case, the jury returned a verdict in favor of Beatrice Kilian and against Bonita Jean Self, John Christian Acker and Campbell's National Car Leasing, Inc., in the amount of $26,700.00 and in favor of Frederick John Kilian against Bonita Jean Self, John Christian Acker and Campbell's National Car Leasing, Inc., in the amount of $8,500.00 and costs were subsequently assessed in the amount of $612.70.

"6. That the judgment entered in favor of Beatrice Kilian and the judgment entered in favor of Frederick John Kilian remain unsatisfied to this date.

"7. That in the case styled Kilian v. Self, Acker, and Campbell's National Car Leasing, Inc., the parties were represented by the following counsel. For Bonita Jean Self, Robert Nunez of St. Petersburg, Florida; for Acker and Campbell's National Car Leasing, Inc., the firm of Macfarlane, Ferguson, Allison & Kelly of Tampa, Florida; for Beatrice and Frederick John Kilian the law firm of Hardee, Ott & Hamilton, of Tampa, Florida. Additionally, Bonita Jean Self was represented by the firm of Masterson, Lloyd, Sundberg & Rogers of St. Petersburg, Florida, but this firm did not participate in the actual trial of case No. 68–443 Civil T."

In the trial of this case witnesses have been heard, and the record in the prior case, that is, the *Kilian* case tried before Judge Ben Krentzman, No. 68–443 Civ. T., which was affirmed per curiam by the Court of Appeals, Kilian v. Campbell's National Car Leasing, 5 Cir., 433 F.2d 356, was introduced in evidence.

To reach the bad faith issue involved in the instant case, a review is necessary of the issues surrounding the injuries to the Kilians and of the settlement negotiations which took place thereafter among counsel for all parties. At the pretrial in the *Kilian* case, the facts agreed to were stated as follows [Court's Ex. A]:

### "AGREED FACTS"

"The plaintiff and the two defendants were involved in a three-car auto-

mobile collision a short distance north of the intersection of Pass–A–Grille Way and 21st Avenue in Pass–A–Grille Beach, Pinellas County, Florida, on or about May 30, 1967, at approximately 3:30 P.M. The said intersection is controlled by a red, amber and green stop-and-go light. The plaintiff BEATRICE KILIAN was a passenger in an automobile owned and operated by her husband. The defendant BONITA JEAN SELF was the operator of an automobile owned by her, and the defendant JOHN C. ACKER, JR. was the operator of a vehicle owned by the defendant CAMPBELL'S NATIONAL CAR LEASING, INC. CAMPBELL'S NATIONAL CAR LEASING, INC. is a Florida corporation. All of the defendants are Florida residents. The plaintiffs are residents of the State of Texas. All of the vehicles were being operated in a northerly direction at the time of the accident, the order of the vehicles being that the first or northerly vehicle was that of the defendant SELF, the second or middle vehicle was that in which the plaintiff BEATRICE KILIAN was a passenger, and the third or southerly vehicle was that being operated by the defendant ACKER. The front of the KILIAN automobile struck the rear of the SELF automobile and the front of the ACKER automobile struck the rear of the KILIAN automobile. The time sequence as to when who struck who is disputed."

At the pretrial it is to be noticed also that Kilians, as plaintiffs, made the following contentions [Court's Ex. A]:

"PLAINTIFFS' CONTENTIONS"

"1. The defendant SELF made an improper stop in the middle of the northbound lane of Pass–A–Grille Way to talk with or pick up some boys on the side of the street and without pulling to the curb or giving any signal for stopping.

2. When the vehicle operated by the plaintiff FREDERICK JOHN KILIAN necessarily stopped behind the defendant SELF'S automobile, the defendant ACKER was not paying attention to his driving and did not see that the plaintiff's vehicle had necessarily come to a stop and crashed into the rear of plaintiff's vehicle, driving the plaintiff's vehicle into the defendant SELF'S vehicle and injuring the plaintiff BEATRICE KILIAN.

"3. That both the defendant SELF and the defendant ACKER were guilty of negligence in the operation of their vehicles and that each contributed to the injuries sustained by the plaintiff."

It should be stated also at this point that both defendant drivers in the *Kilian* case were minors, that is, Bonita Jean Self was 18 years of age, and John Christian Acker, Jr., was 20 years of age at the time of the accident. The Kilians were and are represented by C. J. Hardee, Jr., Esq., an experienced trial counsel of the Florida Bar. He at all times contended that both defendants were guilty of concurrent negligence in the Kilian accident. It was apparent that the Kilians were not guilty of any negligence so that from Mr. Hardee's viewpoint he had a good case on liability against two insured defendants.

His clients desired to settle the litigation. Their first demand was $30,000.00, but just prior to trial it was reduced to $15,000.00, and it is noticed that under the Mary Carter compromise the Kilians settled their case against Acker for $8,000.00. It is this Court's conclusion that had Allstate conducted settlement negotiations in good faith the claim against Miss Self, Allstate's insured, would have been settled well within the policy limits. It is clear in this record that Allstate arbitrarily refused to offer a single dollar in settlement of the Kilian claims.

This Court agrees and has adopted certain excerpts from the memorandum brief submitted by B. J. Masterson, Esq., attorney for Bonita Jean Self, on the issues before me. He says:

In the present case the carrier's insured was an eighteen year old girl.

194

The carrier recognized her immaturity by filing a motion for the appointment of a guardian ad litem to protect her interests. The carrier asked the court to appoint its attorney, Robert F. Nunez, as guardian ad litem and the court did so. As is stated in 17 Fla. Jur., Infants, Sect. 33, p. 340, "The guardian ad litem is responsible to the minor for his conduct in connection with the litigation as if he were a regularly qualified guardian." The appointment of the guardian ad litem was made pursuant to Federal Rule 17(c) and had the effect of making the minor plaintiff a ward of the court for the purpose of the litigation. It also had the effect of imposing an even higher duty upon the carrier's counsel to protect the interests of the ward.

The case thus presents a situation in which the insured, a young girl, who had been sued for damages for substantial personal injuries, was entirely dependent upon her insurance carrier for protection. The carrier had selected her attorney. The carrier controlled the investigation of the accident, the trial of the lawsuit, and the settlement negotiations. It also had its attorney appointed guardian ad litem of the minor insured. The insured was excluded from all participation in the preparation and trial of the case and from all settlement discussions. Plaintiff's Exhibit 1 (the Allstate file) conclusively establishes the extent to which the carrier controlled the case. The summaries of depositions, the evaluation reports, the reports of the status of the litigation and the determination not to negotiate are all matters of communication between Allstate and Mr. Nunez. . . . The end result of Allstate's handling of the entire case was a judgment for $35,812.70 against the young girl they were under a duty to protect. . . .

The result in the case of Kilian, et al. v. Self, et al. should have surprised no one. The report of the police officer who investigated the accident is incorporated in Plaintiff's Exhibit 1.

It shows that the only driver charged with a violation of law was Miss Self. The depositions of the Kilians and their testimony at trial was that Miss Self had stopped suddenly (See page 98 of Excerpts of Transcript of Testimony). Finally, and most important of all, the "Attorney's Suit Status Report" submitted by the expert trial attorney Allstate had selected, Mr. Nunez, clearly indicated the exposure of Miss Self. . . . Mr. Nunez evaluated his chances of winning the trial as "Fair". . . . The range of verdict was anticipated to be $12,000. to $18,000. if the case were lost. . . . The case cried out for settlement. Mr. Nunez did not feel he had a "good" chance of winning and if he lost, the minor plaintiff was exposed to a probable excess verdict. . . .

It should be noted that at line 15 of the Attorney's Suit Status Report, Mr. Nunez estimated the cost of defending the suit to be $2200.00 to $2500.00. Surely the carrier was under a minimal duty to offer this sum to protect the interests of its insured. It would have cost the carrier nothing. Mr. Hardee testified under oath in these proceedings that a contribution of $2500.00 from Allstate would have settled this case. (See page 13 of his testimony). Not only did the carrier refuse to offer a sum equal to the cost of defense but also it refused to offer even the pittance recommended in settlement by its attorney, seven hundred and fifty dollars. (See line 11 of the report).

. . . . The report standing alone is indicative of Allstate's callous indifference to the interests of its insured requiring a finding of bad faith. There is, of course, other evidence of this indifference. See Mr. Nunez' letter of March 19, 1969, incorporated in Plaintiff's Exhibit 1, in which he pointed out to Allstate the urgency of permitting him to take certain key depositions in Corpus Christi, Texas, and stated that "it has been my experience that having depo-

sitions taken by attorneys who are unfamiliar with my approach to its defense usually proves just short of disastrous." Mr. Nunez then said, "The fare to Corpus Christi, Texas, and back is $130.20 . . . ." Apparently anticipating that his request would be denied—as it was—he said, "However, I shall do my best to overcome this severe handicap in the trial of the above case." In short, Allstate refused to follow the urgent recommendation of the attorney it had selected to defend the case on a matter which he stated was so vital as to invite a result which "usually proves to be just short of disastrous." The interests of the young insured were receiving little or no consideration at this point.

This is a case which could have been settled at a modest level had Allstate made the slightest effort to do so. Instead it stubbornly and obstinately refused to even explore the possibility of settlement. After taking over the exclusive right to negotiate, it simply refused to conduct negotiations. No counteroffer was ever made by Allstate to any settlement proposal made by Mr. Hardee.
. . .

At this point it should be mentioned that the insurance carrier for co-defendants, Campbell and Acker, Jr., was the Continental National American Group represented by Charlie Luckie, Jr. Mr. Luckie is an experienced Tampa trial counsel. In contrast to Allstate's arbitrary position that it would not contribute to a settlement with the Kilians or even explore settlement possibilities with Kilians' counsel, Mr. Luckie affirmatively explored and conducted negotiations toward the settlement of the whole case. He contacted Mr. Nunez, counsel for Allstate. He attempted to get a contribution from Allstate toward a final settlement. Mr. Luckie informed Mr. Nunez of his conversation with Mr. Hardee, that is, that Continental would pay $7500.00 toward a complete settlement. He inquired whether Mr. Nunez could

get a contribution from Allstate. On being rebuffed, Mr. Luckie made his Mary Carter settlement with Mr. Hardee.

In a situation wherein there are two minor defendants each charged with negligence, the insurance coverage of each defendant is a major factor in settlement negotiations among counsel. The boy-defendant was driving a leased automobile owned by a corporate-defendant, Campbell's National Car Leasing, Inc., and as Allstate well knew the Acker coverage was $100,000.00 (Testimony of Robert F. Nunez, p. 74).

Mr. Nunez' thinking with respect to the Kilians' case is revealing where he says:

"As this was a case where obviously Charlie Luckie's clients were liable, no question about it, I fully expected before we went into the trial, for Mr. Luckie to make a pretty vigorous effort to try to keep Miss Self in to get the Jury to return a verdict against her so he would have somebody to share the burden and, so the fact that he tried a vigorous case was expected, and that is the way it came out." (Tr. pp. 87, 88)

But under these circumstances and being acquainted with the Florida law of no contribution between joint tort feasors and with the Mary Carter decisional law, Mr. Nunez did not inquire of Mr. Luckie whether he had made any arrangements or any offer to negotiate a settlement with Mr. Hardee, and Mr. Nunez was at no time made aware of the Kilian settlement with Mr. Luckie's client. However, he was knowledgeable as to the possibility of a Mary Carter settlement; Mr. Nunez says (Tr. pp. 89, 90):

"That is inherent in every case that has multiple defendants.

"I thought it most unlikely in this case because Charlie Luckie's clients had the large coverage and my client had the small, and if he was going to make one of these deals with anyone, he should make it with me, so his cli-

ent could still have a bite at the deep pocket, as the guy with all the insurance coverage."

"THE COURT: You took a chance on that. That was your judgment."

"THE WITNESS: Yes sir. I thought Mr. Hardee was a very smart man and I didn't think any lawyer would deliberately set up his client, you know, prevent his client from having access to the big insurance."

"THE COURT: You never discussed it with Hardee during the trial, the possibility of settling the case for less than $9,500 dollars?"

"THE WITNESS: No sir."

There is some discrepancy in the testimony between Mr. Hardee and Mr. Nunez with regard to their discussions as to settlement negotiations in the *Self* case prior to trial. Mr. Hardee testified that he talked with Mr. Luckie, and he informed him that his clients would settle the case for $15,000.00. He then said (Tr. pp. 12, 13):

"I heard back from Mr. Luckie a few days advising that his client felt that was a fair figure and that they would pay half of it, $7500 dollars.

"He said that he had talked to Mr. Nunez and that Allstate wouldn't pay anything and he asked me if I would talk to Mr. Nunez. So, I then talked to Mr. Nunez, and at the same time, Mr. Luckie said the $7500 dollars which is half of the $15,000 dollars, is not a firm figure. We are not going to stand on it if Allstate will make any kind of a substantial contribution we will pay more than that.

"So, I had a complete discussion with Mr. Nunez about what had happened with Mr. Luckie and I asked him if he could get some kind of a contribution from Allstate and he said he would.

"I remember he went over, told me at least, that he was going out to their Regional Office which is in St. Petersburg and sit down and talk with them personally to try to get $2500 dollars.

"I didn't tell him but my client would have taken the $2500 dollars, $10,000 dollars against my advice because I advised him that $15,000 dollars was the minimum.

"Then the next day I talked to him and he said that they wouldn't pay anything. They would not authorize anything, not a penny and then the case had to be tried."

It should be emphasized at this point that Mr. Hardee's recollections as to his conversation with Mr. Nunez are to be accepted. Mr. Nunez did not recall the conversation mentioned by Mr. Hardee. It is to be noticed from the above that he had an offer from Mr. Luckie for $7500.00 and knew that it was negotiable. The Kilians desired to settle. In many instances it is easy to say that hindsight is a great thing, but generally speaking it should not be considered. But under the peculiar facts in this case hindsight is informative. Mr. Nunez told Mr. Hardee that he would try to get $2500.00. Mr. Nunez journeyed to St. Petersburg for that purpose. But the very next day Mr. Hardee called Mr. Nunez and Nunez informed him that Allstate would not authorize anything—"Not a penny."

■■ Counsel for these parties cited many decisions of various courts on the duty of insurance carriers in cases of the kind before this Court. There is no doubt, however, that Liberty Mutual Insurance Company v. Davis, 5 Cir., 412 F.2d 475 (1969), a decision of the Court of Appeals written by Judge Wisdom, is authoritative, and that decision stands for the proposition that the insurer must act in good faith toward the insured in its effort to negotiate a settlement. This principle is stated at page 480:

"[1] Later decisions of this Court and of the Florida courts make it clear that, 'In Florida the Insurer is liable for the excess over policy limits for failure to exercise good faith in the defense, handling and settlement of a claim against the Assured.' Bur-

ton v. State Farm Mutual Automobile Insurance Co., 5 Cir. 1964, 335 F.2d 317, 324 n. 14."

In the decision cited, also the Court approved the instructions:

". . . that the insuror must give a consideration to the interest of the insured equal to that consideration given its own interest in the matter, and it must act with good faith in all transactions involving the insured's interest."

■■ This Court has concluded that Allstate is guilty of bad faith in failing to explore the possibility of settling and in failing to make at least a minimum offer of settlement. Allstate's counsel was guardian ad litem for its insured, a minor. It is reasonable to expect, as any experienced trial lawyer would, that in the factual situation presented in the Kilian trial, a jury would likely find both minor defendants negligent. Allstate arbitrarily gambled away its insured's interest on the proposition that plaintiff would look to the $100,000.00 coverage of the second defendant in collecting a verdict. It overlooked the possibility of the Mary Carter settlement and did not even make an inquiry as to it. Mr. Nunez knew of the Hardee-Luckie negotiations, that is, to the extent at least that Mr. Luckie was agreeable to the one-half payment of a $15,000.00 settlement. Mr. Nunez knew that Mr. Hardee had mentioned $2500.-00, but his answer to Mr. Hardee was that Allstate would not offer a penny. A demand had been made on Allstate by Miss Self's personal counsel to settle her liability within the policy limits. Counsel for defendant seems to take the position in this case that under the factual situation there was no further duty on the part of Allstate to negotiate. It is contended that the only offer was the $9500.00 offer of settlement made by Mr. Hardee in his letter during the course of the trial. But this Court finds that the bad faith on the part of Allstate commenced at a much earlier time. This Court holds that Allstate had an

affirmative duty to explore settlement possibilities and did not do so. It is, therefore, liable to the plaintiff in this case for the full amount of the liability imposed upon her, as a result of the Kilian trial.

The foregoing comprises the Findings of Fact and the Conclusions of Law as permitted under Rule 52.

A separate Order for Judgment is entered.