ROVA FARMS RESORT, INC., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. INVESTORS INSURANCE COMPANY OF AMERICA, A NEW JERSEY CORPORA-TION, DEFENDANT-APPELLANT AND CROSS-RESPON-DENT.

Argued January 21, 1974—Decided August 7, 1974.

476

Mr. *Robert F. Novins* argued the cause for plaintiff-respondent and cross-appellant (*Messrs. Novins, Novins, Farley & Grossman,* attorneys; *Mr. Edward F. Liston, Jr.,* on the brief; *Mr. Novins,* of counsel).

Mr. *Elmer J. Bennett* argued the cause for defendant-appellant and cross-respondent-petitioner (*Messrs. Carpenter, Bennett & Morrissey,* attorneys; *Mr. Michael S. Waters* and *Ms. Heather Mullett,* on the brief; *Mr. Thomas L. Morrissey,* of counsel).

The opinion of the Court was delivered by

HUGHES, C. J. We consider here cross appeals from the Appellate Division affirmance (*Rova v. Investors,* 124 *N. J. Super.* 248 (1973)) of a judgment entered by a trial court, sitting without a jury, generally in favor of a plaintiff against the defendant, its insurer. The claim rested on alleged bad faith by the insurer in exposing its insured to payment of substantial sums in excess of policy limits, for which sums recovery was sought and awarded below. Plaintiff, responding here in defense of its judgment, is Rova Farms Resort, Inc., a New Jersey corporation, which we shall call variously "Rova" or "the insured." Appealing from the judgment against it is Investors Insurance Company of

America, also a New Jersey corporation, hereafter referred to as "Investors," "the insurer," or "the insurance company."

The sequence of relevant events began with an accident entailing severe personal injuries, which occurred on the premises of Rova, on which it operated a recreational resort in Jackson Township, New Jersey, including a lake used by commercial guest patrons for diving and bathing. Investors had issued to Rova its policy of comprehensive general liability insurance which was in full force and effect on the date of accident. In the usual form, it bound Investors to pay on behalf of Rova " * * * all sums which the insured shall become legally obligated to pay as damages because of bodily injury, * * * sustained by any person and caused by accident," with a limitation of $50,000. The policy also obligated Investors to defend any suit against the insured alleging such injury and seeking damages on account thereof. The contract further entitled Investors to make such investigations, negotiations and settlement of any claim or suit as it might deem expedient and, while binding the insured to cooperation with Investors, forbade the insured, except at its own cost, to make or pay any settlement.

Such was the contractual relationship between Investors and Rova on July 25, 1965, when Rova's commercial invitee, Lawrence McLaughlin, dove from a "diving platform" into 3 or 4 feet of murky water under circumstances described in the carefully detailed opinion of Justice Francis, writing for this Court, in *McLaughlin v. Rova Farms, Inc.*, 56 *N. J.* 288 (1970). And no gesture was made in the instant litigation or otherwise to question or palliate the significance of the terrible physical injury sustained when McLaughlin's head struck the unseen bottom of the lake.[1]

---

[1] "He struck the bottom and suffered tragic injuries, sustaining fractures of the fourth and fifth cervical vertebrae and damage to the spinal cord. His body is paralyzed from the fifth cervical vertebra down and he has very little movement of his arms. He is almost a total quadriplegic and the condition is permanent." (*McLaughlin v. Rova*, 56 *N. J.* at 299).

Suit was instituted by McLaughlin, joined in by his wife for consequential loss, against Rova and its general manager. Investors, as its contract obligated it to do, assumed the defense of the action, assigning an experienced trial attorney, Mr. Milton D. Liebowitz, to conduct it. There was extensive pretrial discovery, including depositions of McLaughlin and others and, in the usual course Investors fully investigated the circumstances, interviewing and taking statements from relevant witnesses, preparing photographs and the like.

At one stage before trial, plaintiffs were successful over objection in adding to their original allegation of negligence against Rova an additional charge of willful and wanton misconduct on its part in the operation and maintenance of the facility. The investigations and pretrial discovery were chiefly oriented toward the main issue in the case, i. e., the conduct of Rova, whether negligent or willfully and wantonly tortious, and the alleged contributory negligence of McLaughlin. Naturally, this pretrial preparation did not bear importantly on the damage issue inasmuch as McLaughlin's injuries were so severe as to be quite beyond question.

The injection of the additional issue of willful and wanton negligence caused Investors to warn its insured of its denial of coverage of any such wrongful conduct, as distinguished from ordinary negligence, and to invite Rova's attention to the advisability of its retaining independent counsel for its own protection. Heeding such admonition, Rova did retain counsel, Mr. Nathaniel H. Roth, to act in its interest. Thereafter, although he was not permitted to participate in the actual trial because of Investors' preemption of the defense (as was its contractual right),[2] Mr. Roth did participate in

---

[2]This is the usual situation in the relationship between the attorney retained by the insurer and personal counsel of the insured. By the terms of the policy, as Professor Keeton has pointed out, the relationship is one under which the company retains control of the defense

settlement discussions during trial, pointedly and repeatedly suggesting the vulnerability of Rova to excess liability loss in view of the grave injuries involved. He constantly inquired as to Investors' willingness to offer its policy limit and urged it to do so, and in fact at one point was permitted in an open court discussion (in the absence of the jury) to denounce what he considered the cavalier conduct of both counsel for plaintiffs and Investors in failing to reach the attitudinal détente essential to settlement.

The McLaughlin case came to trial on June 10, 1969, before Judge Rosenberg and a jury in Passaic County. McLaughlin was present the first trial day, strapped in a wheelchair, and was presumably seen by judge and jury, but that night became so ill that he was not released from the hospital to return on subsequent days and his testimony entered the case by way of reading his deposition (*R.* 4:16–1(c)). On that first trial day Investors offered $12,500 in settlement of the case, that figure approximating the "special" damages of Mr. McLaughlin at some earlier stage during discovery. At no time thereafter did Investors increase that offer, albeit its policy limit was $50,000 and any verdict beyond that would have to be paid by its insured.

Not surprisingly, in view of the grave injury involved and its lifetime consequences, the jury returned a verdict for the plaintiffs in a total amount of $225,000, $15,000 thereof being allocated to the wife for consequential losses. An appeal was directed by Investors to the Appellate Division. Even the magnitude of the verdict returned did not impel Investors to increase its offer nor to explore otherwise the possibility of settlement. The Appellate Division reversed in an unreported opinion, holding that the insured's negligence as

---

and the insured's attorney participates by sufferance. Keeton, *Liability Insurance and Responsibility for Settlement,* 67 *Harv. L. Rev.* 1136, 1169 n. 77 (1954). This totality of control exercised by the carrier's counsel should result in a particularly keen alertness on the part of the company and its attorney to settlement opportunities which would protect the insured.

proved was not so gross as to justify a finding of willful, wanton conduct, and therefore the judge had erred in failing to withhold this issue from the jury. Because the jurors may have found willful and wanton negligence by Rova Farms and have consequently disregarded any ordinary contributory negligence by McLaughlin, the case was remanded for retrial. Mr. Liebowitz reminded Investors in an opinion letter (which it had solicited) that the issue of bad faith in dealing with settlement should be of concern to it since, in the event of an adverse verdict "[t]he potential exposure in this case involving severe personal injuries could be up to $500,000.00." Still Investors, through its Claims Committee, comprised in major part of experienced lawyers, did not flinch at this dismal prospect, perhaps because its eventuation could harm Investors only to the extent of 10% of such projected verdict. As it happened, there was no retrial, for this Court reversed the Appellate Division and reinstated the verdict. *McLaughlin v. Rova, supra.* Investors thereafter paid its $50,000 and Rova, with much difficulty, including a nationwide fund appeal to its members (Rova has a relationship to a church-social membership group not relevant here), a mass meeting at Rova Farms to raise money, and finally the obtaining of the bulk of the funds from a mortgage loan on its property, paid the excess judgment of $175,000 plus accrued interest thereon, completing such payment on August 7, 1970.

Having thus suffered from what it deemed the bad faith of Investors in not settling or attempting in good faith to settle the case against it, Rova sued Investors in the instant action for such losses plus counsel fees, and for interest on the total excess loss paid by it from the time such sums were paid until the time of entry of judgment in the present case. (Interest thereafter on the judgment here reviewed runs from the date of entry of judgment under *R.* 4:42–11(a) and that question is not issuable here.)

After full hearing on the merits, the trial judge on May 12, 1972, entered judgment for Rova against Investors for the amount of the excess judgment which Rova had paid, $175,000, plus the interest which it had had to pay thereon, making a total judgment of $197,150.68. Later the court amended such judgment to allow counsel fee to. Rova's attorney under *R.* 4:42-9 (a) (6) (the counsel fee is not involved in this appeal), but denied plaintiff's application for assessment of additional interest for the interval above mentioned.

The Appellate Division having affirmed the trial court's judgment, this Court granted certification (63 *N. J.* 580 (1973)). Investors challenges the judgment against it on the principal ground that it had not, on the whole case, validly been adjudged to have exercised bad faith in the premises. Collaterally, it suggests (1) the relevance of a specific offer to settle within policy limits (which latter it denies) as bearing on the legitimacy of a "bad faith" issue, and (2) that Rova by equivocation as to its financial capacity to contribute thereto, "prevented" settlement and should by reason of such "unclean hands" be estopped from recovery. The frivolous nature of these latter points of appeal can best be demonstrated in the context of our discussion of the main issue, the trial court's basic finding of bad faith on the part of Investors.

Rova's cross-appeal challenges that part of the judgment below (undisturbed by the Appellate Division) which denied it interest on the excess amount it says it wrongfully was caused to pay on August 7, 1970, between that date and the date of the entry of judgment here under review, May 12, 1972.

Considering first the scope of our appellate review of judgment entered in a non-jury case, as here, we note that our courts have held that the findings on which it is based should not be disturbed unless "* * * they are so wholly in-

supportable as to result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter. *Greenfield v. Dusseault,* 60 *N. J. Super.* 436, 444 (App. Div. 1960), aff'd o. b. 33 *N. J.* 78 (1960). That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance. *Brundage v. New Jersey Zinc Co.,* 48 *N. J.* 450 (1967). Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence. *New Jersey Turnpike Authority v. Sisselman,* 106 *N. J. Super.* 358 (App. Div. 1969), certif. den. 54 *N. J.* 565 (1969). It has otherwise been stated that "our appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," *Fagliarone v. Twp. of No. Bergen,* 78 *N. J. Super.* 154, 155 (App. Div. 1963), and the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions. *Weiss v. I Zapinsky, Inc.,* 65 *N. J. Super.* 351, 357 (App. Div. 1961).

We turn to the examination of the record below with such standards in mind, as bearing on the validity of the trial judge's determination that Investors failed to use good faith with regard to its contractual liability to Rova and that Rova for such cause was entitled to judgment. That such contractual obligation embodies an implied covenant of good faith and fair dealing is not in issue here, nor indeed do we think it is presently open to substantial question. See *Radio Taxi Service, Inc v. Lincoln Mutual Ins. Co.,* 31 *N. J.* 299 (1960); *Bowers v. Camden Fire Ins. Assoc.,* 51 *N. J.* 62 (1968).

I

We note that substantial evidence before the court revealed a multitude of circumstances which should have impelled Investors to energize a clearly attainable settlement of the McLaughlin claim. Settlement at trial could have been arranged for $75,000, an amount which plaintiffs' attorney was authorized by his clients to accept, as was made known to the McLaughlin trial judge, to Liebowitz, to Roth and, through Liebowitz, to Investors. During those somewhat hectic trial days there were raised many storm signals of potential financial disaster in the face of which Investors maintained a singular imperturbability, never increasing its first-day offer of $12,500. The mere appearance at the trial of a 27 year old man, visibly and unquestionably shattered for life, was a factor which might have been expected to inspire concern to a seasoned trial attorney (as no doubt it did) and to his client, an experienced insurance company.

During the customary "settlement" conferences the trial judge, aware of the grave physical aspect of the case and the unpredictability of jury results, suggested that Investors might be well advised to pay its policy limit and this was promptly reported by Liebowitz to Investors. Liebowitz added his own recommendation to Investors that it pay $50,000 "if that would settle the case." Investors remained unmoved. The McLaughlins' attorney stated he would recommend acceptance of $50,000 to his clients, if it were offered, and asserted that although he would not try to coerce them to accept it, he had "fairly good control" of them (a way of saying that they respected his advice). Rova had instructed Roth previously that, if Investors put up its $50,000, he was authorized to add $25,000, which Rova somehow would raise and pay. Roth never disclosed this to Liebowitz because he feared, in view of the adamant stance of Investors, unmoved by the exhortations not only of the court but of its own attorney, that he would be exposing his client to share in the payment of an amount contractually the obligation of

Investors to pay, *i. e.*, the policy limit. For this reason he dissembled, asserting that his client had no money, which was literally true, but begged the question of its non-liquid property potential (not beyond the scrutiny of Investors had it cared to look) which was eventually used to raise money by mortgage to pay the bulk of the obligation cast upon it by this unhappy debacle of honest communication.

And Roth's fears were not unfounded, for in response to his pleas to Liebowitz to offer Investors' policy limit Liebowitz kept exhorting Roth to announce his client's willingness to contribute something, and this (in view of the apparent "stonewall" nature of Investors' $12,500 offer), was in itself suggestive of bad faith.[3] Liebowitz never told either plaintiffs' attorney, Mr. Rapuano, or Roth that he had recommended to his company that it pay $50,000, nor did he make any further effort to settle the case. Had he done so, and had some belated accident of logic persuaded Investors that it had a problem on its hands, settlement would clearly have been attainable. Investors' unresponsiveness persisted despite the fact that Liebowitz from beginning to end had been concerned about the bad faith danger to his client and had even

---

[3] A demand that the insured contribute to a settlement for an amount within policy limits was the sole basis of liability in one of the earliest cases imposing excess liability on a carrier. *Brown & McCabe, Stevedores, Inc. v. London Guarantee & Accident Co.*, 232 *F.* 298 (D. Ore. 1915). A suggestion that insured contribute toward a settlement, though carrier was not offering the maximum within its limits was one of the factors relied on to support excess liability in the following cases: *Am. Mut. Liab. Ins. Co. v. Cooper*, 61 *F.* 2d 446 (5th Cir. 1932), *cert.* den. 289 *U. S.* 736, 53 S. Ct. 595, 77 L. Ed. 1483 (1933) ; *Boling v. New Amsterdam Cas. Co.*, 173 *Okl.* 160, 46 *P.* 2d 916 (1935). *See also Home Ins. Co. v. Royal Indemn. Co.*, 68 *Misc.* 2d 737, 327 *N. Y. S.* 2d 745, 748 (Sup. Ct. 1972), aff'd 39 *A. D.* 2d 678, 332 *N. Y. S.* 2d 1003 (App. Div. 1972). Since an effort by the carrier to induce the insured to participate in a settlement within policy limits is evidence of bad faith, an insurer invites trouble if it suggests a contribution without making it clear that the company stands ready to contribute its entire policy limit. Keeton, *Insurance Law*, § 7.8(c) (1971).

warned it by letter of the language of our case of *Bowers v. Camden Fire Ins. Assoc., supra.*[4] The Claims Committee, apparently the architect of Investors' decisions, also had given thought to its obligation to act in good faith and was concerned about the spectre of "bad faith" at the very meeting at which it set its apparently inflexible settlement figure of $12,500.

This sciential grasp of its legal duty, however, did not interrupt the even tenor of Investors' policy of containment at the level of $12,500 although it never had any illusion, nor had its attorney, that its insured could escape the risk of jury confrontation on the issue of fault vis-a-vis the grave injury involved. Mr. Liebowitz not only realized, but reported to the insurance company that a potential verdict could exceed $50,000, that the McLaughlins could produce a prima facie case of negligence, that he, Liebowitz, "* * * could not see getting out of this case on a motion," and that he "* * * could never have seen Judge Rosenberg or any other judge not permitting this case to go to the jury." Hence, from the time of first view of this unfortunate plaintiff in the courtroom, Investors had ample opportunity to understand that its fate (and that of its exposed insured) would rest in the hands of a jury and it would not be rescued by control of the issue by the court as a legal matter.

Even after the chastening effect of the $225,000 verdict (as ameliorated by appellate reversal and direction of a new trial) and Liebowitz' advice to Investors that it should

---

[4]"When it is probable that an adverse verdict will exceed the policy limit, the propriety of an insurer's refusal to accept a settlement offer which is within the coverage requires a resolution of conflicting interests. In our judgment, in view of the duty of the insurer to act in good faith, the resolution can lead to but one fair result: Both interests can be served justly only if the insurer treats any settlement offer as if it had full coverage for whatever verdict might be recovered, regardless of policy limits, and makes its decision to settle or go to trial on that basis. That rule, which we deem to be the appropriate one, has been applied in other jurisdictions in such cases." [*Bowers, supra,* 51 *N. J.* at 71–72].

think about the brooding issue of "bad faith" in the context of a possible $500,000 verdict, Investors maintained its strange aplomb. Perhaps this was responsive to the recommendation of its Claims Manager who urged the Claims Committee, though indeed it was conscious of its "good faith" obligation, to have nevertheless "* * * the courage of their convictions." It may not be too cynical to observe that by this time it was apparent that a large proportion of the cost of exhibiting such courage might have to be paid by other than Investors, namely, one to whom it had promised coverage and good faith in providing the same.

The reluctance of Roth to volunteer a contribution by Rova supported by his protestations of its cash poverty, was an element of the "fencing" which was a part of the settlement discussions during trial. We think the relevant culpability of Roth's participation in this technique diminishes to the vanishing point under the twin factors of Investors' unconscionable appeal that Rova contribute to a settlement underpinned by its offer of 25% of its policy obligation and the astute observation expressed by Judge Wiley below:

> I think the insurance company has almost a fiduciary duty to protect their insured and, if there is any fencing to be done, the last person that is going to do it is the insurance company. They have to act in good faith to protect the interest of their client.

Investors and its counsel seemed quite sanguine as to the prospect of convincing a jury of McLaughlin's contributory negligence. That hope survived the abandonment (by way of inability to offer proof thereof) of two bases on which it, among other things, originally rested, *i. e.*, intoxication and foreknowledge of the depth of the lake water on the part of McLaughlin. The reasonableness of its prejudice against settlement, based on this hope, is not persuasive of good faith, considering the haunting possibility of financial disaster. In fact, Investors' belief in its eventual vindication seems to have been somewhat aberrational in nature, since even at trial of the instant case (long after our Supreme Court had confirmed a finding of liability to the extent of

$225,000) lawyer members of the Claims Committee continued to express the firm view that *McLaughlin v. Rova* was a "no liability" case.[5]

Although Investors knew after the McLaughlin judgment that Rova could not even produce an appeal bond, and Rova was subjected to supplementary proceedings, execution and levy on its property, Investors was unmoved by concern for its insured to re-explore the possibility of settlement. And when this Court granted certification of the McLaughlin case, a new dimension was added to the existing prospect of retrial, in that this Court might (as it eventually did) reinstate the $225,000 judgment. Even this did not cause Investors to quail. Nor did the insurance company hesitate on occasion to reject its lawyer's advice. When Liebowitz during trial advised his client to consider offering $50,000 if that "would settle the case," here was the response as testified below by Claims Manager Scheer, who had been kept advised by Liebowitz of these settlement discussions:

Q. Did you accept his advice?

A. We couldn't, the demand was never made.

When Liebowitz, after retrial had been ordered by the Appellate Division, advised Investors of the prospect of an adverse verdict of $500,000 and recommended the offering of $50,000 at an appropriate time, here was Mr. Scheer's response as he recalled it at trial below:

Q. Did you make an offer?

A. No.

Q. Did you follow Mr. Liebowitz's advice?

A. No.

█ Apropos Investors' submission that it regarded the McLaughlin case one of questionable liability, and conceding that prescience is not expected of a carrier, we recall that we noted in Bowers, *supra,* that "[a] decision not to settle must be a thoroughly honest, intelligent and objective one.

---

[5] The "reserve" card kept by Investors' president to remind him of the case valuation said "severe injury — weak liability."

It must be a realistic one when tested by the necessarily assumed expertise of the company." This expertise must be applied, in a given case, to a consideration of *all the factors* bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial. *Garner v. Am. Mut. Liab. Ins. Co.*, 31 *Cal. App.* 3d 843, 107 *Cal. Rptr.* 604, 607–608 (1973). In this connection we observe that no one associated with the McLaughlin case ever doubted that in the event of an adverse verdict, the damages awarded could greatly exceed the limits of coverage; and as to liability, the question is not whether the carrier, its attorney, or the insured considers a defendant liable but what the jury could be justified in finding from the evidence available and adduced. *Cf. Board of Education v. Lumbermens Mut. Cas. Co.*, 293 *F. Supp.* 541, 547 (D.N.J. 1968), aff'd 419 F. 2d 837 (3rd Cir. 1969).

It is not necessary to speculate whether the basis of Investors' odd attitude toward the McLaughlin case was based on an inbred or institutional cynicism about swimming or diving accidents, nor to seek its further motives, nor to further particularize the testimony below. That evidence forged a ponderous chain of circumstance which not only amply supported the finding of bad faith on the part of Investors, but would suggest wonder as to how the Court could have reached any other conclusion. This is particularly so when one considers the development of the law with respect to the fiduciary responsibilty of an insurance carrier toward its assured, in instances of judgmental choices such as existed here.

## II.

The appellant insurer would argue that, as a matter of law, it had no obligation to offer its policy limit in settlement without a firm, authorized and explicit demand within that figure on the part of McLaughlins' attorney. It points out that in each of the four major New Jersey cases[6] involving the question of the carrier's liability for an excess judgment, the claimant had formally offered to settle the action for a sum not exceeding the coverage of the insured. Since in the present instance no such demand was ever presented, the insurer maintains that no conflict between its interests and those of the insured ever emerged and, consequently, it cannot be held to have exercised less than good faith in not settling the claim for the face amount of the coverage.

This seems to us an unduly constricted view of the law. Although the cases cited involved claimant offers either during trial or pending appeal, their delineation of the carrier's obligation of good faith would clearly embrace the situation vis-a-vis settlement disclosed in the instant case. When Investors suggests that no conflict of interest can exist, in law, under any circumstances until there has been a formalized offer within policy limits by plaintiffs, it may be thinking of older concepts, before the emergence and development of those principles of equity, fair dealing and good faith (such as in the very cases Investors cites) which breathed new lifegiving honesty into the bare contractual relationship sometimes mentioned as existing between insured and insurer. *Cf. McDonald v. Royal Indemnity Ins. Co.*, 109 *N. J. L.* 308 (E. & A. 1932) ; *Auerbach v. Maryland Cas. Co.*, 236 *N. Y.* 247; 140 *N. E.* 577 (Ct. App. 1923).

---

[6]*Radio Taxi, supra; Bowers, supra; Kaudern v. Allstate Ins. Co.*, 277 *F. Supp.* 83 (D. N. J. 1967) ; *Board of Education v. Lumbermens Mut. Cas. Co., supra.*

There was always, in fact and in law, a conflict of interest between Investors and its insured from the time it realized the gravity of McLaughlin's awful injury and recognized that its insured must one day confront a jury, unspared from such ordeal by legal control by the trial court and vulnerable, under the most simplistic view of the probabilities, to an excess verdict far beyond the policy limit. These factors projected immediately the most urgent duty to act in good faith and with diligence in attempting to arrange a possible settlement, including the policy limit, even if something had to be added by Rova. Only thus could the larger interest of Rova be protected.

██ We must here reiterate our observation in *Bowers, supra*, that "[g]ood faith is a broad concept." And that where under the policy the insurer reserves full control of the settlement of claims against the insured, prohibiting him from effecting any compromise except at his own expense, that reservation — viewed in the light of the carrier's obligation to pay on behalf of the insured all sums up to the policy limit which he shall become obligated to pay — imposes upon the insurer the duty to exercise good faith in settling claims. We pointed out, as we had before (*Radio Taxi, supra*), that the purpose of this type of insurance is to protect the insured from liability within the limits of the contract, and that, therefore, the courts cannot allow the insurer to frustrate that purpose by a selfish decision as to settlement which exposes the insured to a judgment beyond the specific monetary protection which his premium has purchased.

██ By virtue of the terms of such a policy, proscribing the insured from settling in his own behalf, the carrier has made itself the agent of the insured in this respect. *Fidelity & Cas. Co. v. Robb*, 267 F. 2d 473, 476 (5th Cir. 1959). Thus the relationship of the company to its insured regarding settlement is one of inherent fiduciary obligation. *Bowers, supra; Radio Taxi, supra*, 31 N. J. at 313 (Jacobs, J. dissenting) ; *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566,

108 *Cal. Rptr.* 480, 491, 510 *P.* 2d 1032, 1043 (1973) (Roth, Justice pro. tem. dissenting). When an opportunity for settlement approximates the limit of coverage, it may be tempting for the insurance company to gamble on the outcome of a trial, its exposure not being considerably affected by a verdict in excess of coverage. *See Kaudern, supra,* 277 *F. Supp.* at 88; *cf. Dumas v. State Farm Mut. Auto Ins. Co.,* 111 *N. H.* 43, 274 *A.* 2d 781, 784 (1971). Recognizing that such temptations on the part of the carrier are directly in conflict with the interest of the insured in settling within the limits of coverage and thereby avoiding the prospect of excess judgment, this Court declared that where, as in the present case, any adverse verdict at trial is likely to exceed the policy limit, the boundaries of good faith become more compressed in favor of the insured, and the carrier can justly serve its interests and those of its insured only by treating the claim as if it alone might be liable for any verdict which may be recovered. *Bowers, supra; Board of Education, supra.*

■■ Despite the fact that the holdings in *Bowers* and the other main New Jersey cases cited involved firm claimant offers, it would be unrealistic to believe that such an offer is a prerequisite for finding the insurer to have acted other than in good faith. *See* Keeton, *Insurance Law,* § 7.8(c) (1971). The better view is that the insurer has an affirmative duty to explore settlement possibilities. 7A Appleman, *Insurance Law and Practice,* § 4711, p. 405 (1974 Supp.) ; *Self v. Allstate Ins. Co.,* 345 *F. Supp.* 191, 197 (M. D. Fla. 1972). At most, the absence of a formal request to settle within the policy is merely one factor to be considered in light of the surrounding circumstances, on the issue of good faith. *Cernocky v. Indemnity Ins. Co. of No. Amer.,* 69 *Ill. App.* 2d 196, 216 *N. E.* 2d 198, 205 (1966).

Even those cases in other jurisdictions which have found in favor of the insurance company on the basis that no settlement demand was made by the injured party, generally suggest that the evidence did not indicate that such a settlement

could have been effected in any event. *See, e. g., Cotton States Mut. Ins. Co. v. Fields,* 106 *Ga. App.* 740, 128 *S. E.* 2d 358 (1962); *Merritt v. Reserve Ins. Co.,* 34 *Cal. App.* 3d 858, 110 *Cal. Rptr.* 511 (1973); *LaRocca v. State Farm Mut. Auto Ins. Co.,* 329 *F. Supp.* 163 (W. D. Pa. 1971), aff'd 474 *F.* 2d 1338 (3rd Cir. 1973). In *Merritt,* for example, the court declared:

At no time did [the claimant] make any offer to settle, nor did he or his counsel or his compensation insurance carrier ever advance any suggestion that settlement could be profitably discussed. [110 *Cal. Rptr.* at 524].

\* \* \* \*

No suggestion that settlement was feasible was ever made prior to judgment by anyone connected with the suit. [*Id.* at 525].

Similarly the court noted in *LaRocca* that the claimants' attorney "was not asked and did not testify that he would have settled *or recommended settlement if the $50,000 policy limits were* offered \* \* \*." 329 *F. Supp.* at 171 [emphasis supplied]. *Contra,* (almost precisely) in the McLaughlin case, in which, as we have seen, the opportunities for settlement were so viable that it took a special genius at intransigence to kill them.

Nor were Roth's protestations of his client's poverty an excuse for Investors. It had a clear way out for the sealing of the issue of good faith (had it been willing to expend its policy limits); for as Professor Keeton has observed:

The company may protect itself against excess liability, where the settlement value of the claim is recognized as being in excess of the policy limits by making an offer to settle for the maximum sum within the policy limits, or by advising insured of continued willingness to pay such sum at any time that the claim can be settled for that sum or for that sum plus whatever the insured is willing to add. [Keeton, *Liability Insurance and Responsibility for Settlement,* 67 *Harv. L. Rev.* 1136, 1148 (1954)].

Despite the testimony of counsel below that he thought an explicit demand from the McLaughlins was a prerequisite to

movement on his part, this attitude is discordant with the requirement that the company in its fiduciary role was bound to consider itself potentially liable for the entire amount of any judgment. We do not think that Investors would have been so complacent if in fact its coverage for Rova had been unlimited.

The proposition that an insurer cannot be found liable for an excess judgment except where a firm and binding offer has been made and refused, was rejected by a federal court in *Fidelity & Cas. Co. v. Robb,* 267 *F.* 2d 473, 475–476 (5th Cir. 1959). *See also Young v. American Cas. Co.,* 416 *F.* 2d 906, 910–911 (2d Cir. 1969). Similarly, in *Bell v. Commercial Ins. Co. of Newark, N. J.,* 280 *F.* 2d 514 (3rd Cir. 1960) the insurer had believed that because claimant's demand of $25,000 was beyond the policy limit, the company was not obligated to seek a settlement within the coverage, and it had therefore not attempted further negotiations. Upon reversing a directed verdict for the carrier, the Court of Appeals observed:

Although the trial judge insisted that Bell [the insured] only showed that the claimants in the personal injury action had offered to settle for $25,000, there was testimony from Bell which if believed, would support the conclusion that during the course of the trial a suggestion had been made by counsel for claimants which, if at least explored, could well have led to settlement within the policy limits, and that he had reported this to the insured's counsel. [280 *F.* 2d at 516].

The Supreme Court of Tennessee has explicitly held that an insurance company may be held liable for bad faith for a judgment in excess of its policy limits although it never received a settlement demand for or within the face amount of coverage. *State Auto Ins. Co. v. Rowland,* 221 *Tenn.* 421, 427 *S. W.* 2d 30, 32–34 (1968). There the carrier took the position that "until the injured party has offered to settle the case for an amount within the policy limits, the company is under no legal duty to attempt to effectuate a settlement."

It was insisted that "until such an offer is made there is no conflict of interests between the company and its insured." 427 *S. W.* 2d at 33. The court replied:

> We are asked to hold as a matter of law that an insurance company cannot be held liable for bad faith for failing to settle a case when there is no demand for settlement for an amount of money which is within the limits of coverage afforded by the policy of insurance. We are of the opinion that such is not the law nor should it be so. [427 *S. W.* 2d at 34].

We, too, hold that an insurer, having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingnuess of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available. *Young, supra,* 416 *F.* 2d at 911. From what has been said it is clear that an opposite pattern of fact existed here.

## III

We rest our decision here on the plenitude of evidence below to support the findings to which we have adverted. Yet we view with some unease the effect that our present rules might have, in a more constricted future case where a more plausible decision against settlement might nevertheless expose an insured to excess loss, an opportunity to settle having been rejected. Under our present rule it is the insured and not the company which is called upon to pay an excess when the carrier's evaluation goes awry and is not adopted by the jury, so long as the company's judgment is not viewed

as being actually dishonest, unreasonably optimistic or otherwise in bad faith, or infected with negligence such as to impede the reaching, or having the capacity to reach, a "good faith" decision.

Thus, by force of law, the situation of an insured (who comes among that class of "consumers" for whose general protection there has been increasing concern in recent years), threatened by a possible excess verdict, is not an enviable one.

The assured is not in a position to exercise effective control over the lawsuit or to further his own interests by independent action, even when those interests appear in serious jeopardy. The assured may face the possibility of substantial loss which can be forestalled only by action of the carrier. Thus the assured may find himself and his goods in the position of a passenger on a voyage to an unknown destination on a vessel under the exclusive management of the crew. [*Merritt v. Reserve Ins. Co.*, 34 *Cal. App.* 3d 858, 110 *Cal. Rptr.* 511, 519 (1973)].

Although the insured has contracted with the company for a specific amount of coverage, he is powerless to make the carrier use that coverage in a settlement for his protection.

The normal legal remedy for conflicts in interest is separate representation for the conflicting interests. This remedy, however, possesses only a limited usefulness in the present situation, for while the assured can be advised, as he usually is, that he may employ separate counsel to look after his interests, separate representation usually amounts to nothing more than independent legal advice to the assured, since control of the litigation remains in the hands of the carrier. Control of the defense of the lawsuit cannot be split, and independent legal advice to the assured cannot force the carrier to accept a settlement offer it does not wish to accept. In this instance the normal legal remedy of separate representation is an inadequate solution to the conflict in interest. [*Merritt, supra*, at 519].

The conflict problem arises out of the current interpretation of "good faith" in this and most other jurisdictions. Good faith has been construed to require the insurer to consider the interests of the insured as well as its own in deciding whether or not to settle the case within the limits of the policy. The company must weigh the conflicting interests by making its decision to settle or go to trial as if it had full coverage for whatever verdict may be re-

covered, regardless of policy limits. *See, e. g., Bowers, supra;  Board of Education, supra,* 293 *F. Supp.* at 544; *Koppie v.  Allied Mut. Ins. Co.,* 210 *N. W.* 2d 844, 847 (Iowa 1973);  *Crabb v. National Indemn. Co.,* 205 *N. W.* 2d 633, 635  (S. D. 1973). *See also,* Note, *An Insurance Company's Duty  to Settle,* 41 *S. Cal. L. Rev.* 120, 130 (1968).

Yet however much the carrier considers the interests of  its insured in pondering the decision as to settlement, the  moment it decides not to settle, it in effect, however reason-  ably, sacrifices the interests of the insured in order to pro-  mote its own. It is always to the benefit of the insured to  settle and thereby avoid the danger of an excess verdict.  Since an insurer serves only its own interests by declining to  compromise within the insurance coverage, a decision not to  settle is perforce a selfish one. In attempting to save some  of its own money on the policy, the company necessarily and  automatically exposes the insured to the risk of an excess  judgment. *See Note, Excess Liability*: *Reconsideration of  California's Bad Faith Negligence Rule,* 18 *Stan. L. Rev.*  475, 483 (1966). This is particularly significant when any  settlement opportunity approximates the policy limit. If the  insurer, having chosen to go to trial wins the litigation it  pays nothing except expenses; should it be unsuccessful it  loses no more than it would have had to pay in settlement,  since any excess is placed upon the shoulders of the only true  loser, the insured.

Moreover the rule which permits a carrier to escape li-  ability for excess unless its decision to go to trial is marred  by dishonesty, bad faith or negligence creates an anomalous  situation for insureds. Where a settlement opportunity ex-  ists, the more faultless the client seems to have been the  more feasibly he may be subjected by the company to a trial  of the case and all the dangers it entails. In the case of an  obviously blameworthy client, the carrier would normally  take advantage of a settlement opportunity within policy lim-  its since any other disposition would be unduly optimistic.  The least blameworthy insured, however, may more readily

be delivered to face the risk of excess judgment, since a refusal to compromise a case thought to be a "no liability" case would not be regarded as unreasonable. Thus, in those cases where a compromise may be effected within policy limits the more innocent an insured appears to be, the worse position he is in and the more he is exposed to loss.

Additionally, even the rule requiring the carrier to form its judgment as though it alone were liable for the entire risk may be polluted by institutional considerations which ignore the interests of the specific insured involved. *See* Note, *supra,* 41 *S. Cal. L. Rev.* at 128. These considerations may extend to a purpose to keep future settlement costs down, to numb the public's claim-consciousness, to create a conservative image for the discouragement of future claimants or to establish favorable precedents, none of which purposes has anything to do with the protection of the particular insured at hand. Such efforts, it might be hoped, would result in overall savings to the company by discouraging the pressing of marginal claims or by creating a body of low-verdict cases which could be used as a bargaining tool in settling subsequent claims. *See* Note, *supra,* 18 *Stan L. Rev.* at 482–483. Institutional interests of this nature might be pursued by carriers whether or not they were liable for the entire amount of a specific adverse verdict; yet it is generally the insured in the particular case who has had to bear the burden of any excess loss stemming from such an "institutional" decision not to settle.

But much more importantly we recall that we have indicated that a carrier bears a *fiduciary* relationship to its insured; yet the good faith norm, as presently construed, permits the insurer to be less responsive to the fiducial obligation than is any other type of fiduciary. One appellate court, though applying the norm, pointed out its unique effect in this regard.

The duty of good faith thus imposed upon the carrier is one peculiar to this situation. In most legal relationships determination of the merits of conflicting interests by one of the parties to the con-

flict is forbidden. No man can be judge in his own case; no trustee may weigh his personal interest against that of his beneficiary; no agent may evaluate his personal profit against that of his principal; and no public officer may balance private gain against public interest. Yet the carrier who receives an offer to settle an excess claim within policy limits is instructed to weigh its own interest on the scales along with those of its assured in order to make a good faith determination whether to accept or reject the offer. [*Merritt v. Reserve, supra*, 110 *Cal. Rptr.* at 521].

One day, in an appropriate issue, it may be necessary to separate these conflicting interests. The insured has the right to expect that the amount of protection he has purcha ed will be offered in compromise where necessary to effect an end to the litigation. On the other hand, the insurer may pursue its own interests and decline to settle a case, for whatever reason (so long as not in bad faith or similarly wrongful). These elements apart, it is contractually free to offer a fraction of its insured's policy limit or nothing at all. However, where the carrier chooses not to offer the limits of coverage, one wonders whether it should not bear the unhappy financial result of that unilateral decision, since it alone profits from the opposite result of the gamble. This resolution would enable the insurer to pursue its own interests in great measure without sacrificing those of its insured so long as it was clear by whom the burden of mistake should be borne.[7] The kind of rule we project, which would settle the nagging conflicts of interest under present law, has already been regarded favorably by some. *See Crisci v. Security Ins. Co.*, 66 *Cal.* 2d 425, 58 *Cal. Rptr.* 13, 17, 426 *P.*

[7] It is contended by some that a new rule, requiring the carrier in all cases to bear the financial consequences of its failure to offer its policy in settlement, will make it easier for plaintiffs' counsel to extract money from insurers by means of nuisance suits, will increase claims costs, and will thereby raise premium rates substantially. We note, however, that under the doctrine presently in force the company, supposedly, is already making settlement decisions as though it would be liable for the entire sum of any adverse verdict. Therefore, a carrier should be no more willing to settle under such a broadened rule than it is at present, and should in such an event prove no easier prey to unreasonable plaintiff demands than now. Were a

2d 173, 177 (1967); Comment, 47 *Neb. L. Rev.* 705 (1968); Note, *An Insurance Company's Duty to Settle,* 41 *S. Cal. L. Rev.* 120, 138–142 (1968); *Note, Excess Liability: Reconsideration of California's Bad Faith Negligence Rule,* 18 *Stan. L. Rev.* 475, 482–485 (1966); *Note, Insurer's Refusal to Settle — A Proposal for Imposition of Liability Above Policy Limits,* 60 *Yale L. J.* 1037, 1041–1042 (1951); Comment, 48 *Mich. L. Rev.* 95, 102 (1949); Note, 13 *U. Chi. L. Rev.* 105, 109 (1945). In *Crisci, supra,* the Supreme Court of California observed:[8]

Obviously, it will always be in the insured's interest to settle within the policy limits when there is any danger, however slight, of a judgment in excess of those limits. Accordingly the rejection of a settlement within the limits where there is any danger of a judgment in excess of the limits

carrier to settle more often or at higher figures than it presently does, this fact would only suggest that the company has been ignoring the standards set forth by this Court.

Furthermore, any conceivable effect on costs which such a rule could exert might be more than offset by other factors. For example, savings might be realized from the company's not having to maneuver for position on the issue of bad faith during the original trial, or from not having to litigate excess liability suits brought by its clients. The history of the McLaughlin case is one in which such cost-inflating factors stand out prominently, for Investors' trifling with its good faith fiduciary obligations visited upon it the substantial financial loss adjudged below.

In any event, the possibility that a broadened standard may increase insurance rates should not alone defeat its adoption. An insurer's decision not to settle is justified on the basis of that decision's contribution, in keeping costs down, to the benefit of all insureds. Since policyholders as a class, rather than the particular individual involved in a case, thus profit from the company's refusal to settle within the coverage afforded, then surely insureds as a whole should share the expense when the refusal results in an excess judgment. *See* Note, *An Insurance Company's Duty to Settle,* 41 *Cal. L. Rev.* 120, 139 (1968). Cost, reasonably distributed, should never be an impediment to the doing of justice.

[8]The court, however, omitted actual application of such a rule on grounds that the present standard provided a sufficient basis on which to impose liability in the case under consideration. [58 *Cal. Rptr.* at 17, 426 *P.* 2d at 177].

can be justified, if at all, only on the basis of interests of the insurer, and, in light of the common knowledge that settlement is one of the usual methods by which an insured receives protection under a liability policy, it may not be unreasonable for an insured who purchases a policy with limits to believe that a sum of money equal to the limits is available and will be used so as to avoid liability on his part with regard to any covered accident. In view of such expectation an insurer should not be permitted to further its own interests by rejecting opportunities to settle within the policy limits unless it is also willing to absorb losses which may result from its failure to settle.

The proposed rule is a simple one to apply and avoids the burdens of a determination whether a settlement offer within the policy limits was reasonable. The proposed rule would also eliminate the danger that an insurer, faced with a settlement offer at or near the policy limits, will reject it and gamble with the insured's money to further its own interests. * * *

Finally, and most importantly, there is more than a small amount of elementary justice in a rule that would require that, in this situation where the insurer's and insured's interests necessarily conflict, the insurer, which may reap the benefits of its determination not to settle, should also suffer the detriments of its decision. [58 *Cal. Rptr.* at 17, 426 *P.* 2d at 177].

As indicated, it is unnecessary in the instant case to embrace such an extended rule. But since this Court as all other courts, seeks to prevent the law from inflicting unjust results, it is not discordant with its obligation, to foresee the probability or the possibility thereof.[9]

---

[9]"* * * [T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. To that end, the Court may express doubts upon existing doctrines * * *." [*Busik v. Levine*, 63 *N. J.* 351, 363 (1973)].

## IV.

Lastly, we turn to Rova's cross-appeal challenge of the trial court's refusal to award it prejudgment interest on the $197,150.68 sum that the insured was required to pay the McLaughlins. Whether or not prejudgment interest should be ordered in a successful action for the overage arising out of a carrier's failure to settle a claim has not frequently been considered by the various jurisdictions of the nation. Some have held that such an action sounds in tort rather than contract and therefore interest should run only from the date of the insured's judgment against the insurance company. *See, e. g., Southern Farm Bureau Cas. Ins. Co. v. Hardin,* 233 *Ark.* 1011, 351 *S. W.* 2d 153, 156 (1961). This same reasoning — that the litigation is not a suit on the insurance contract but one in tort — has also been used as the basis for precluding an award of attorney's fees arising out of the action. *See Crabb v. National Indemn. Co., supra,* 205 *N. W.* 2d at 639.

We note that in New Jersey even the labelling of excess liability suits as purely tortious in nature would not preclude the award of interest to insureds, since here prejudgment interest is required in actions in tort by virtue of Court Rule 4:42–11(b). *See also Busik v. Levine,* 63 *N. J.* 351 (1973).[10] To apply *R.* 4:42–11(b) to successful suits of this nature would, however, present various difficulties. Interest would not run from the time the insured paid the excess to the claimant and thus was deprived of the money's use, but

---

[10]*R.* 4:42–11(b) provides in part:

In tort actions, including products liability actions, the court shall include in the judgment interest at 6% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later.

We stated in *Busik* that this rule extends to cases which came to trial after its effective date, January 31, 1972, although the tort involved may have occurred prior to the rule's adoption. 63 *N. J.* at 355, 360–361. The trial between Rova Farms and Investors began on April 24, 1972.

from the date he instituted his action against the insurer or from a time six months after the date of the insurer's "tort," whichever was later. Yet at what point in time may an insurer's failure to settle be said to occur? For example, did Investors' "tort" take place prior to the McLaughlin trial, when the carrier did not initiate settlement negotiations; or during the first few days of trial, June 10 through June 12, 1968, when a settlement opportunity was most apparent but not tested; or later, when Investors allowed the trial to continue to the point of a jury verdict? Or did the tort occur on June 22, 1970, when that verdict was rendered final by action of this Court; or later still, when the insurer refused to pay the excess and, on August 7, 1970, Rova actually did so? Application of R. 4:42–11(b) would require an answer to such questions because a date six months subsequent to some of the above points in time would be later than the institution of Rova's suit against the carrier on November 20, 1970.

However, it is unnecessary to resolve the issue since we do not think that compensation should be dependent on what label we place upon an action, but rather on the nature of the injury inflicted upon the plaintiff and the remedies requested by him. A wrongful failure to settle, wherein the insurer has breached the fiduciary obligation imposed by virtue of its policy, sounds in both tort and contract. See *Crisci, supra,* 58 *Cal. Rptr.* at 18, 426 *P.* 2d at 178. Investors' disinclination to effect a settlement resulted in the excess verdict in question; and the carrier's failure to pay the overage required Rova Farms to do so. As a result, from August 7, 1970, when Rova paid $197,150.68 in satisfaction of the McLaughlin judgment, the insured was deprived of these monies, whereas the carrier, having refused to pay the excess itself, thereby had the use of the sum. Thus, despite the company's desire at trial to characterize the present action as simply one in tort, we feel that an appropriate award of prejudgment interest should run from the date that the

insured paid the claimant the $197,150.68. This course was taken in *Board of Education v. Lumbermens Mut. Cas. Co., supra,* where the federal court specifically awarded interest on the excess "from the date upon which the [insured] paid that amount." 293 *F. Supp.* at 555.

In the present case, the trial judge did not refuse to impose prejudgment interest because he agreed with Investors' view that the action before him sounded merely in tort. The fact that he awarded attorney's fees on the basis of *R.* 4:42–9 (a)(6) — "In an action upon a liability or indemnity policy of insurance" — indicates that he regarded the nature of the case in part as a suit upon an insurance contract. Rather, the judge decided that Rova was not entitled to interest because it had not proved that it gave interest on the monies acquired to pay the McLaughlins and therefore did not show that it had suffered a specific loss of interest by dint of the payment. The judge decided that at least some of the monies paid may have been supplied to Rova by affiliated members and consequently may never have actually come from corporate assets of the resort. In short, it was thought that because there was insufficient proof that Rova paid interest on the sum with which it satisfied the judgment or that it took the money from a bank account or asset of its own, losing interest thereby, no interest might be imposed on Investors by the court.[11]

While an equity court has discretion in awarding interest (*see Busik, supra,* 63 *N. J.* at 395 (Mountain, J. dissenting)), a proper exercise of that discretion requires that the judge be aware of the alternatives open to him for consideration. Here, the judge appears to have believed that he did not have the power to impose prejudgment interest in the case at hand because plaintiff did not prove it literally gave or lost interest on the money paid. We reverse on this issue, since we feel that such a view is a mistaken one.

---

[11] We assume for argument that the trial court's findings are correct, although our review of the facts indicates that all but $35,000 was obtained by Rova through a mortgage on its assets.

At least in the case of a liquidated sum, prejudgment interest has been regarded by our courts as compensatory — to indemnify the plaintiff for the loss of what the monies due him would *presumably* have earned if payment had not been refused. *See Busik, supra,* 63 *N. J.* at 356, 358. The issue is not whether the plaintiff can prove a loss by virtue of having had to pay interest to get the money or by having lost interest from a bank account or investment through removal of the sum therefrom. The loss, rather, is assumed. *See Jersey City v. O'Callaghan,* 41 *N. J. L.* 349, 354 (E. & A. 1879) ; *Kamens v. Fortugno,* 108 *N. J. Super.* 544, 554 (Ch. Div. 1970). The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question ; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled. *See Small v. Schuncke,* 42 *N. J.* 407, 416 (1964) ; *Busik, supra,* 63 *N. J.* at 359, 360. This consideration has controlled, and interest has been imposed even where, as here, the defendant had in good faith . contested the validity of the claim. Thus, in *Kamens v. Fortugno, supra,* 108 *N. J. Super.* at 552–553, it was held that pre-judgment interest on a claim, the amount of which is ascertained, is not avoided by honest disputation over legal liability. The court observed that "defendants had the use of the money and *presumably* earned such interest, dividends or other benefits therefrom as were available," whereas the plaintiff was deprived of any such enjoyment. 108 *N. J. Super.* at 554 [emphasis supplied].

In the case before us, the trial court found that Investors ought to have settled the McLaughlin action or satisfied the entire judgment which resulted from its culpable failure to do so. In short, it determined that Rova was entitled to reimbursement for the amount it paid out on August 7, 1970. Thus, from that date Investors has had the use of a sum of which Rova was deprived and has been able to invest for gain

$197,150.68 to which it would not have had continued access but for its refusal to satisfy the full McLaughlin verdict. It makes no difference that part of the monies Rova delivered may have been contributed by affiliated individuals rather than obtained from an interest loan or corporate bank account. Investors, which has been earning money on the excess it declined to pay, cannot defeat Rova's claim for interest on such a basis, any more than it could avoid its liability for the excess itself on grounds that others helped Rova satisfy it.. Such contention ignores considerations analogous to those underlying the "collateral source" rule of tort, which holds that a wrongdoer cannot claim the benefit of contributions to the plaintiff made by others. *See Palusco v. Prince Macaroni, Inc.,* 50 *N. J.* 365, 368 (1967); *Rusk v. Jeffries,* 110 *N. J. L.* 307, 311 (E. & A. 1933); *Skillen v. Eagle Motor Co.,* 107 *N. J. L.* 211, 213 (Sup. Ct. 1931); 2 Harper and James, *Torts* § 25.22 (1956). The fact remains that Rova and its donors have, since August 7, 1970, been denied the use of $197,150.68 of which Investors has had the benefit. Any rights which the plaintiff's contributors may have to reimbursement out of the insured's recovery extend beyond the area of the insurer's legitimate concern.

The judgment below is affirmed in full as to all points except the interest issue. The decision as to interest is remanded to the trial court for disposition according to the considerations discussed in Part IV of this opinion.

CLIFFORD, J. (concurring). While I do not join in all of the Court's reasoning, nevertheless I reach the same result as the majority because of a singular feature in this case. The fact that defendants in the original action, Rova and its general manager, were charged with both negligence and willful and wanton misconduct looms large in my determination of whether the insurance company discharged its obligation to the insured. It brings an additional and significant dimension to the question of good faith and fair dealing in the face of over-the-limits exposure.

When plaintiffs amended the complaint to include a charge of willful and wanton negligence, Investors' attorney and its claims manager both notified Rova that the policy in question excluded coverage for such conduct and that any judgment based thereon would not be paid by the carrier. They invited the participation of the insured's personal attorney, to protect Rova's interests "in the event that the jury should find that [Rova] acted in a willful or wanton manner" and to cooperate in the defense of the case (note that the personal attorney's participation was suggested not because of any stated apprehension of the plaintiffs' verdicts being returned in excess of the policy limits but because there now was a claim based on conduct excluded by the policy).[1]

The Company's vice-president and attorney of record, who acted as claims manager, testified in this cause that the amendment allowing the additional issue of willful and wanton misconduct was significant in its potential for exposing the insured personally to liability "without regard to the policy."

While it is not at all clear to me that under the language of this policy and particularly in the absence of any exclusion (see n. 1 *ante*) the Company would not have covered, to the extent of compensatory damages within the policy limits, an accident occasioned by willful and wanton misconduct, see *Hanover Insurance Group v. Cameron,* 122 *N. J. Super.* 51, 60 (Ch. Div. 1973); *Prosser, Torts,* (4th Ed. 1971), § 34 at 184, nevertheless that was the asserted position of Investors and the position from which it established and conducted its relations with its insured.

---

[1] In fact the policy contains no such specific exclusion as is frequently found in comprehensive general liability policies. The insurance agreement for bodily injury liability in the policy in question reads as follows:

Bodily Injury Liability: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.

Given that position I think we need go no further than to hold that the Company's cavalier disregard of the insured's interests clearly fell below the required standard of fairness and good-faith dealing with its insured for this reason: it undertook to incur an unreasonable risk on behalf of the insured (who, under Investors' view of its obligation, would have been liable for the entire amount of any verdict based on willful and wanton misconduct) while retaining unto itself complete control of the case. Put another and perhaps excusably colloquial way, it presumed to gamble its insured's money with its own dice against most unattractive odds. The fact that its own money was likewise at risk does not blunt the conflict which had ripened in the relationship between the Company and the insured.

Had it sought resolution of that obvious conflict, as it should have done, the declaratory judgment technique was available to answer the critical question: were plaintiff Lawrence McLaughlin's injuries due to negligence or to willful and wanton misconduct on the part of defendants? Well before this Court's decision in *Burd v. Sussex Mutual Insurance Company,* 56 *N. J.* 383 (1970), decided after the trial of the McLaughlin claim,[2] there was abundant authority, both here and elsewhere, for the use of the declaratory judgment procedure to decide coverage questions. See, *e. g., Farm Bureau Mutual Automobile Ins. Co. v. Hammer,* 177 *F.* 2d 793 (4 Cir. 1949); *Stout v. Grain Dealers Mutual Ins. Co.,* 307 *F.* 2d 521 (4 Cir. 1962); *Merchants Indemnity Corp. v. Eggleston,* 37 *N. J.* 114 (1962); *Ohio Casualty Insurance Co. v. Flanagin,* 44 *N. J.* 504 (1965); *Condenser Service & Engineering Co. v. American Mutual Liability Insurance Co. Inc.,* 45 *N. J. Super.* 31 (App. Div. 1957); *LoRocco v. New Jersey Manufacturers Indemnity Ins. Co.,* 82 *N. J. Super.*

---

[2] For guiding authorities since *Burd,* see *Lyons v. Hartford Insurance Group,* 125 *N. J. Super.* 239 (App. Div. 1973); *Hanover Ins. Group v. Cameron, supra.*

323 (App. Div. 1964). In *Stout v. Grain Dealers Mutual Ins. Co., supra,* the broad policy consideration upon which I focus was put thusly:

[S]ince there exists a genuine issue of whether the injury was intentionally or unintentionally inflicted, then until this issue is decided between the insured and the insurer, the company should not be required to defend the state tort action. *Indeed it could not do so with propriety or satisfaction or fairness either to itself or the assured.* The obvious conflict of interest * * * makes it impossible for the insurance company conscientiously to fulfill the role of defender. [307 *F.* 2d at 523; emphasis supplied]

But Investors, confronted with that conflict, did nothing beyond notifying the insured that it would not furnish coverage for the one phase of the McLaughlin claim. Having made the choice not to seek resolution of the conflict and having retained control of the case, the Company, by perpetuating the prohibited conflict, exposed itself to — and by its conduct incurred — liability for any verdict in excess of its policy limits. It should, at the very least, have gone forward with a vigorous settlement effort marked by particular sensitivity to its insured's exposure. Instead it chose to treat its insured's personal attorney as an adversary and failed to initiate a cooperative and bipartisan approach to settlement. Whatever negotiations looking to possible settlement took place here appear to have originated with the trial judge — an undertaking which, although here necessitated by inexcusable foot-dragging by the attorneys, I for one have always thought better and more appropriately left to lawyers, with rare exceptions. But to the extent that Investors' attorney became involved in that ritual fire dance which all too frequently precedes (and sometimes precludes) settlement, the steps choreographed for him by the insurer were designed inevitably to dance his partner, the insured, into the flames.

Under these circumstances there is ample authority to sustain an affirmance of the Appellate Division on the basis of absence of good faith and fair dealing without resort to

some of the broad concepts employed by the majority, such as principles of fiduciary relationships and undifferentiated consumerism, which I am not prepared to adopt at this time. Further, I am constrained to add that I respectfully but emphatically disassociate myself entirely from Part III of the Court's opinion.

Justice MOUNTAIN authorizes me to express his concurrence with the views set forth herein.

MOUNTAIN and CLIFFORD, JJ., concur in result.

*For affirmance and remandment in part* — Chief Justice HUGHES and Justices JACOBS, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.

*For reversal*—None.