**Britta Randall TANNERFORS, Plaintiff,**

v.

**AMERICAN FIDELITY FIRE INSURANCE CO., Defendant.**

**Civ. A. No. 1149–70.**

United States District Court,
D. New Jersey.

June 13, 1975.

Jung, Dwyer & Lisbona by Fred W. Jung, Jr., Newark N. J., Duane, Morris & Heckscher by Jay J. Lambert, Philadelphia, Pa., for plaintiff.

Krieger, Klein & Shurkin by Arnold G. Shurkin, Passaic, N. J., for defendant.

## OPINION

STERN, District Judge.

This is a diversity action. Plaintiff Britta Randall Tannerfors,[1] a Swedish national, brought suit on August 24, 1970 against American Fidelity Fire Insurance Company[2] (American Fidelity), a New York corporation, as the alleged third-party beneficiary of an insurance contract between American Fidelity and its insured, George Bray, for its alleged failure to act in good faith in discharging its contractual obligations to Bray in the negotiation, settlement, defense and disposition of a personal injury claim made by the plaintiff against Bray, arising out of an automobile accident.

On May 16, 1964, the date of the accident, Bray had in force an insurance contract with American Fidelity which provided in part:

> With respect to such insurance as is afforded by this policy for bodily injury and for property damage liability, the company shall:
>
> (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient . . . .

The limits of the insurance policy were $10,000.00 for injury to one person arising from an accident and $20,000.00 for all injuries arising from any one accident. (N.T. 1.12–1.14)

The sequence of relevant events began with a catastrophic automobile accident which caused several serious personal injuries and one death. On May 16, 1964, a vehicle operated by Bray crashed into the rear of another automobile operated by Raymond Berchtenbreiter. The impact was so severe that Berchtenbreiter's vehicle, as part of a chain reaction, struck an auto operated by Harry Glahn. At the time of the collision, both the Berchtenbreiter and Glahn vehicles were stationary at a red traffic light. Berchtenbreiter died from his injuries, Tannerfors, a Berchtenbreiter passenger, was severely injured, and a third passenger in the Berchtenbreiter auto, Daniel Gernant, sustained relatively minor injuries. Glahn and his passenger, Frances Cooper, also received minor injuries. The Tannerfors injuries, which form the basis for this suit, were immediately known by American Fidelity to be grave: partial paraplegia of the lower limbs. (P–1–a)

In August 1964 a suit was instituted in the Superior Court of Bergen County, New Jersey, by Charles Rodgers, an attorney representing all the occupants of the Berchtenbreiter automobile, Tannerfors, Gernant and the administrator of the estate of Berchtenbreiter, against George Bray, Harry Glahn and the Director of Motor Vehicles as representative of the unknown driver of an abandoned automobile found near the scene of the accident. Glahn cross-claimed against Bray and counterclaimed against Berchtenbreiter's estate. A second suit was instituted against Bray by Frances Cooper, the injured passenger in the Glahn automobile.

On June 8, 1966, the consolidated suits came to trial before a jury on the issue of liability alone. At the close of all the evidence pertaining to liability, the court granted Glahn's motions for involuntary dismissals with prejudice of the claims of plaintiffs Gernant, Tannerfors and Berchtenbreiter against Glahn, and the motion of Berchtenbreiter's adminis-

---

1. At the time of the accident, plaintiff was known as Britta Randall. Prior to the institution of this suit, the plaintiff was married. She instituted suit under her married name. For the purposes of this action she will be referred to only by her married name, Tannerfors.

2. The manager of the American Fidelity Insurance Company is the American Plan Corporation, a subsidiary of American Fidelity. For the purposes of this action, both the parent and subsidiary corporations are collectively referred to as American Fidelity.

trator for an involuntary dismissal of the claims against him by Frances Cooper and counterclaimant Glahn.

The jury thereafter returned a verdict in favor of Gernant, Tannerfors, Berchtenbreiter and Cooper on their claims and in favor of Glahn on his cross-claim, all against the defendant George Bray, and returned a verdict of no cause for action against the Director of Motor Vehicles and against the plaintiffs and Bray on his cross-claim. The jury thus found Bray to be the sole party liable in the consolidated action.

The parties thereafter agreed to proceed with the trial on the remaining issue of damages for personal injury before the court sitting without a jury. The amounts of property damage, the only remaining issue, had been stipulated by the parties.

Based upon the evidence presented, the court entered verdicts on June 29, 1966, in favor of Gernant in the sum of $9,000.00, in favor of Berchtenbreiter's administrator in the sum of $10,000.00 plus the stipulated property damage, in favor of Frances Cooper in the sum of $500.00, in favor of Harry Glahn in the sum of $500.00 plus the stipulated property damage, and in favor of Tannerfors in the sum of $75,000.00, all against the defendant George Bray. (P-1-v)

Because the insurance proceeds under the personal injury provision of Bray's policy were substantially below the sum of the individual judgments, an apportionment was made among the judgment claimants on a *pro rata* basis. (Tr. 2.-134) On the personal injury judgments, Berchtenbreiter's administrator received $5,000.00 and Gernant $4,500.00; Glahn and Cooper's combined share was $500.-00. Tannerfors, whose personal injury judgment greatly overshadowed the combined judgments of the other claimants, received $10,000.00, the maximum amount payable to any single claimant under the personal injury clause of Bray's insurance policy. (Tr. 4.64–4.65)

Further satisfaction of Tannerfors' judgment against Bray was not forthcoming, despite her futile desire personally to pursue him in Florida (Tr. 4.91), until August 21, 1971, when Bray assigned all rights that he had against American Fidelity under the insurance policy arising out of Tannerfors' New Jersey accident lawsuit in exchange for satisfaction of Tannerfors' judgment presently outstanding against him. Following this assignment, leave to file an amendment to the pleadings was sought by Tannerfors and granted by the Court, permitting Tannerfors to assert Bray's claims that American Fidelity had breached its fiduciary duty to him and that it should be held responsible for the excess judgment.[3]

■■■ This case came to trial in the wake of the recent decision of the New Jersey Supreme Court[4] in *Rova Farms*

---

3. Plaintiff was granted leave to amend the complaint to reflect the assignment of rights from George Bray on January 7, 1972.

On April 26, 1972, defendant filed an amended answer asserting the invalidity of the assignment as an additional separate defense.

At the pretrial conference of March 7, 1974, the Court informed both parties that the amended complaint had not been filed. Although plaintiff was thereafter permitted to file the amendment to the complaint, the issue of its relation back to the original complaint was reserved for trial.

Under these unusual circumstances, the Court sees no prejudice to the defendant as a result of the amendment. Defendant was on notice of the assertion of the assignment as a cause of action on January 7, 1972, and in fact filed

a responsive pleading directed to the validity of the assignment.

A .technical omission such as this should not be allowed to work an injustice against the plaintiff. Plaintiff's amendment asserting the assignment will be deemed to relate back to January 7, 1972.

4. Throughout the litigation of this case, both parties have urged that the rights and liabilities of the parties under the insurance policy in suit are to be adjudicated under the substantive law of New Jersey. Defendant, now for the first time, raises in its post-trial memorandum the issue that under New Jersey conflicts of law principles, Florida law, not New Jersey law, should govern the rights and liabilities established by the insurance policy. At trial the defendant stipulated

v. *Investors Insurance Co.*, 65 N.J. 474, 323 A.2d 495 (1974). *Rova Farms* formulated the strict fiduciary duties which insurers must bear when undertaking their contractual obligations to defend their insured against claims by a third party.

■ The Supreme Court's recognition of the inherent conflict of interest between an insurance company and its insured when both face a viable claim by an injured third party, potentially exceeding the policy limits, was the predicate for compelling the insurance company, which has contractually reserved full control of the settlement of such claims under the policy, to act in good faith as an agent of the insured in attempting to arrange a possible settlement.

"When an opportunity for settlement approximates the limit of coverage, it may be tempting for the insurance company to gamble on the outcome of a trial, its exposure not being considerably affected by a verdict in excess of coverage. [citations omitted] Recognizing that such temptations on

that New Jersey law would be applicable to the issue of whether the defendant breached its fiduciary duty to the plaintiff's assignor. (Tr. 1.8) The Court holds defendant to that stipulation. It would, obviously, be improper to do otherwise. A trial held against the background of the law of New Jersey is not, after all the evidence has been adduced, to be judged by the law of Florida.

The Court will nonetheless discuss the issue raised untimely by the defendant:

Under *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1940), a federal court sitting in diversity must apply the conflicts of law principles of the forum state. In the present conflict between the laws of New Jersey and Quebec, the conflicts of law principles of New Jersey, the forum state, govern the limitation period which applies.

*New Jersey's Choice of Law Rules*

In a series of cases beginning with *Mellk v. Sarahson*, 49 N.J. 226, 229 A.2d 625 (1967) and *Pfau v. Trent Aluminum Company*, 55 N.J. 511, 263 A.2d 129 (1970), New Jersey courts adopted the governmental interest approach to choice of law questions. This approach requires a two-step analysis. The court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction. A state is deemed interested only where application of its law to the facts in issue will foster that state's policy. This approach does not count up contacts and make quantitative determinations of interest based on which state has the greatest number of contacts. Instead, the qualitative nature of contacts is considered so that only contacts which are likely to promote valid state policies are considered relevant. *Mullane v. Stavola*, 101 N.J.Super. 184, 243 A. 2d 842, 845 (1968).

*Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28, 31–32 (3rd Cir. 1975) (footnote omitted).

*Rova Farms* evidences New Jersey's strong policy in favor of protecting an insured from the bad faith actions of his insurer in the settlement of claims arising under an insurance policy.

Florida has expressed a similar interest in protecting an insured in similar circumstances. *See Self v. Allstate Insurance Co.*, 345 F.Supp. 191 (M.D.Fla.1972).

The only factual contact with Florida here is that the renewal of the insurance policy in suit was countersigned by American Fidelity's agent in Tallahassee, Florida. (D–12) New Jersey, however, was the forum where the insured was sued, where the defendant acted in bad faith in discharging its contractual obligation to defend the insured, where the insured resided upon the accrual of the claims arising under the insurance policy, and where the insured received the insurance policy in suit.

The qualitative nature of the New Jersey contacts compels the conclusion that the courts of New Jersey would apply the law of New Jersey to determine the rights and liabilities of the parties arising from the manner in which American Fidelity met its obligations under this policy. This Court must, of course, do the same.

Defendants have also submitted a post-trial motion to allow the entry into evidence of Exhibit D–14. The trial transcript reflects that the Court repeatedly asked defendant's counsel if he desired to have D–14 offered into evidence. (Tr. 3.75–3.76) Defense counsel, in response, refused to move for admission of D–14 and even objected to the Court's efforts to enter it into evidence. Because Exhibit D–14 was never properly authenticated, the Court must deny defendant's motion, for under the circumstances, plaintiff never had an opportunity to confront the exhibit.

So that the Court's findings will be complete, however, the Court notes that D–14, if admitted, and even as uncontroverted, does not alter the Court's disposition of this matter.

the part of the carrier are directly in conflict with the interest of the insured in settling within the limits of coverage and thereby avoiding the prospect of excess judgment, this Court declared that where, as in the present case, any adverse verdict at trial is likely to exceed the policy limit, the boundaries of good faith become more compressed in favor of the insured, and the carrier can justly serve its interests and those of its insured only by treating the claim as if it alone might be liable for any verdict which may be recovered. . . . The better view is that the insurer has an affirmative duty to explore settlement possibilities. [citations omitted] At most, the absence of a formal request to settle within the policy is merely one factor to be considered in light of the surrounding circumstances, on the issue of good faith. [citations omitted]

Even those cases in other jurisdictions which have found in favor of the insurance company on the basis that no settlement demand was made by the injured party, generally suggest that the evidence did not indicate that such a settlement could have been effected in any event. [citations omitted]

\* \* \* \* \* \*

We, too, hold that an insurer, having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingness of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer,

by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available.

*Rova Farms, supra,* at 493–496, 323 A.2d at 505–507.

It is against this legal standard that the defendant's conduct in respect to this accident is to be judged.

Within a day or two of the occurrence of the accident, months before the institution of suit against its insured, the American Fidelity claim examiner in charge of the file, Thomas Packert, assigned Phillip Klieger, an independent adjuster, to investigate the accident. (D–5, Tr. 2.22)

The next day, May 17, 1964, Klieger interviewed and obtained Bray's version of the accident embodied in a signed statement. Klieger also inspected Bray's insurance policy.[5] Such interviews with the other drivers and occupants of the accident automobiles as were feasible were also undertaken by Klieger. Klieger incorporated the results of his brief investigation in his report to American Fidelity, dated May 18, 1964. (D–5) The May 18th report was accompanied by a New Jersey newspaper clipping describing the accident. The newspaper clipping (D–4), Klieger wrote in his report, "has a photograph of a mass of steel which cannot be discernible," referring to the death car driven by Berchtenbreiter. (D–5, p. 2)

On May 18, 1964, National Claims Service was substituted for Klieger as the investigator for American Fidelity. William Vogel, an employee of National Claims Service, made his first report on May 22, 1964. This report (P–1–o) dealt largely with the results of inspection of the physical damage to the accidented

---

5. Klieger reported that "the name of our assured, supposed assured, is George Bray of 1552 Anderson Ave., Fort Lee, New Jersey." Klieger also wrote that Mr. Bray "obtained his insurance through L. T. Stanley, P.O. Box 5518, Pensacola, Florida." *The policy listed Bray's address as 816 North W Street, Pensacola, Florida* (D–5, pp. 1–2), according to Klieger's report.

cars. Vogel enclosed photos of all the cars, then located in a junkyard. Vogel's report also stated that his attempts to interview the hospitalized surviving passengers of the Berchtenbreiter auto were thwarted because of their physical conditions. Vogel did interview Bray, but was not comfortable with Bray's explanation of the accident. (P–1–o, p. 1)

Both investigative reports and the accompanying exhibits brought grim news to the defendant. Not only did it appear that its insured had caused the accident, but the resulting claims for injuries and death, let alone property loss, clearly exceeded the policy limits in substantial amounts.

The corporate defendant's immediate reaction to its unhappy position was to attempt to sidestep all liability by demonstrating that its assured, Bray, had obtained the policy by fraud. Seizing on the insurance policy information in the Klieger report, American Fidelity retained a Florida attorney to evaluate the legal ramifications of a declaratory judgment action to invalidate Bray's insurance policy.[6] Although the exact date of the engagement of the Florida counsel is unknown, a letter opinion was sent to American Fidelity on June 12, 1964, which proposed solutions to the legal problems presented by the defendant[7] to Florida counsel.

Bray was not notified at that time of these preliminary steps taken by American Fidelity to disclaim liability under his insurance policy. (Tr. 1.81) When Bray did inquire of Baker & Co., the agent of American Fidelity who wrote his insurance policy, concerning the validity of his policy, Baker apparently replied that "his policy was in good standing." (P–1–a, p. 3)

These communications were summarized in Packert's memo to Harold Levy, American Fidelity's claims manager. (P–1–a; Tr. 1.49)

The tenor of Packert's memo indicates dissatisfaction with the attitude of Baker & Co. and of L. T. Stanley toward disclaiming liability on Bray's policy. As Packert wrote, "Again, it seems to boil down to the fact that our beloved agent, Baker and Company, simply does not care." (P–1–a, p. 3) Packert, himself an attorney, had no difficulty in observing "that liability appears to be probable, to full" at this early date. (P–1–a, p. 1)

The June 30, 1964 memo by Packert concludes with two recommendations designed to insulate American Fidelity from any liability:

> In my opinion we have two alternatives open to us by way of future handling of this file.
>
> The first would be, to disclaim completely on the basis that there was no policy ab initio due to either fraud on the part of the broker and the insured together, or because of the material breach of the contract on the part of the insured in failing to state his speeding violation on his application.

6. Packert, American Fidelity's original claims examiner on the Bray file, testified that the possibility of instituting a declaratory judgment action against Bray evolved from the investigative reports:
> THE COURT: How did that subject rear its head?
> THE WITNESS: Yes. As I think I explained yesterday, this particular risk was written through a book of business that originated out of Florida. It was under writing instructions to write only Florida residents. When we received a note of the accident it was noted that not only did Mr. Bray have the accident in New Jersey, but he also listed a New Jersey address which led us, you know, to inquire as to how could this be. We don't write insurance for New Jersey residents.
> (Tr. 2.14)

7. The legal problems posed from these facts and other facts known to you would appear to be:
> 1. What is the insurance company's liability with regard to the conduct of their insurance agent under Florida law?
> 2. Where would jurisdiction and venue lie if it were necessary to institute suit to cancel the insurance policy?
> 3. Is there a conflict of laws question involved and if so the law of which State would apply?
> (P–1–f)

If we followed this course of action we would, of course, wipe our hands completely of the matter, not appearing in any suit arising out of the accident. If judgment were rendered against the insured, *and it certainly appears that that would be the case,* we would, of course, have to defend any action that the insured would institute against us.

It is my belief that this would be an extremely dangerous course to follow. Our chances of defending an action by the insured against us on a basis of fraud or material breach, are uncertain to say the least. I would not say that our chances would be good at trial.

*It is my recommendation that we follow the second alternative and that is,* handle the file as if there is a valid insurance in effect with no defects. At the same time, I would notify the broker to get in touch with his Errors and Omissions carrier for a possible action. It is well established that a principal can bring an action against one of its agents for the negligent acts of its agents. It is my firm belief that if Mr. Stanley was not guilty of fraud he most certainly was negligent in his soliciting this policy from the insured. If he was not on actual *notice of the fact that the insured resided, or had resided in New Jersey for the past three years,* I don't think it would be too difficult to prove to a jury that he should have known that the insured resided in New Jersey. The slightest bit of investigation on his part would have revealed this fact to him.

I therefore think that he would be charged with constructive notice of the fact that our insured was not a resident of Florida.

I would suggest that no matter what course of action is decided upon that we cancel the insured's policy immediately. We would certainly look ridiculous in Court stating adamantly that had we known . . . . we never would have written the risk if the plaintiff could show that we did not cancel the policy when we were, in fact, put on notice.

(P–1–a, pp. 4–5) (Emphasis added)

Packert's memo of June 30, 1964 was answered by memo of July 7, 1964 (P–1–b) by Harold Levy, Packert's superior. Levy therein proposed a third alternative to extricate American Fidelity — the commencement of a declaratory judgment action by the insurance company against Bray, for the purpose of having the policy declared invalid ab initio, thus relieving the company of all financial responsibility. Levy indicated a desire, however, to secure the opinion of New Jersey counsel whether a declaratory judgment action "would be a wise move."

On July 29, 1964, Packert telephonically retained, on behalf of American Fidelity, the firm of Kristeller, Zucker, Lowenstein and Cohen, of Newark, New Jersey. By letter of July 30, 1964, American Fidelity transferred its file on the Bray accident to the New Jersey law firm to facilitate the declaratory judgment action against Bray. (P–1–c) Milton Gurny, Esquire, an associate of the firm, was assigned to the case. (Tr. 2.68)

Packert testified regarding the purpose of obtaining New Jersey counsel:

Q. From examining that letter [P–1–c], sir, can you tell us what the purpose was in forwarding this file over to Mr. Gurny's law offices?

A. Yes. We sent the file over to Mr. Gurny for a review with the thought in mind of instituting a declaratory action to determine the validity of the insurance policy.

Q. Would this declaratory action have been *against* the insured, Mr. George Bray?

A. Yes. You mean against him?

Q. Yes.

A. Yes, it would have.

(Tr. 1.73) (Emphasis added)

On August 11, 1964, Bray was brought to Gurny's office by an independent in-

vestigator employed by American Fidelity, Giegold. (Tr. 1.74, 2.105) The purpose of the meeting was to determine whether American Fidelity would institute a declaratory action against Bray to void his insurance policy. (Tr. 2.68–2.69)

At the August 11th meeting, attended by Gurny, Bray and Giegold, two topics were discussed. First, Gurny questioned Bray about the facts and circumstances of the accident. Gurny considered this an attorney-client conversation, with Bray the client and Gurny acting as Bray's lawyer. (Tr. 2.80–2.81) No stenographic minutes were taken of this portion of the meeting. The second portion of the meeting concerned the possibility of American Fidelity's filing a declaratory judgment action against Bray. Bray was interrogated on this subject under oath by Gurny before a shorthand reporter.[8] Gurny later testified at trial that during this second conversation he was not acting as Bray's attorney, but as American Fidelity's attorney, investigating to determine if a declaratory judgment action could be brought on behalf of American against Bray. (Tr. 2.69, 2.83) Gurny also procured a non-waiver agreement from Bray at the August 11th meeting (P–1–g), which permitted American Fidelity to proceed with the defense of the accident suit without waiving its right to disclaim liability arising under the Bray's insurance policy. Although no declaratory judgment action was instituted against Bray, at no time did the company execute a rescission of the non-waiver agreement. (Tr. 1.87) The company did not advise Bray of the purpose of the August 11th meeting (Tr. 1.75), nor of his right to retain personal counsel (Tr. 1.78), nor of the significance of a non-waiver agreement. (Tr. 1.85) Attorney Gurny likewise did not advise Bray that he had a right to retain personal counsel in the accident litigation. (Tr. 2.70) In fact, at no time did he advise Bray of his right to retain counsel to protect his personal interests. (Tr. 2.70, 2.88) Nor did he tell Bray that he was not Bray's attorney for purposes of the "bifurcated" meeting. (Tr. 2.70) He explained the meeting to Bray as follows:

> I advised him that the purpose of the meeting was to determine whether there was insurance coverage.
> (Tr. 2.69)

However, Gurny never advised Bray that the company was contemplating instituting a lawsuit against him (Tr. 2.69, 3.53), and the colloquy between attorney Gurny and Mr. Bray, at the conclusion of the stenographic statement (P–1–e), cannot be said to be reasonably likely to apprise a layman of the potential dynamics of the situation:

> Q. Now, you understand that the reason I've asked you these questions is because there is some doubt concerning your insurance, and particularly L. T. Stanley. Do you understand that?
>
> A. Yes.
>
> Q. And American Fidelity Fire Insurance Company is conducting an investigation right now, and with Stanley to get this matter straightened out, right?

Understandably, Bray believed that the investigation was one being conducted by the insurance company of its agent, L. T. Stanley. (Tr. 3.52–3.54)

Gurny communicated the results of his declaratory judgment investigation to American Fidelity in his letter of August 13, 1964 (P–1–d), in which he concluded that a declaratory judgment against Bray would not be productive. This letter terminated that strategy by the defendant which, up to that moment and unknown to its assured, had been devoting the major part of its efforts in regard to the accident to an attempt to disclaim responsibility for the conduct of the assured.

On September 21, 1964, Bray was called before the Municipal Court in

---

8. The record of this conversation is embodied in P–1–e.

Little Ferry, New Jersey, for a preliminary hearing to determine whether he should be held for the grand jury on a charge of causing death by auto. Gurny secured authorization to represent Bray at the preliminary hearing from American Fidelity (P–1–h), and attended the hearing as counsel to Bray. (Tr. 3.12) The charges in the Little Ferry Municipal Court were dropped for insufficient evidence.

Subsequently, and before November of 1966, Bray moved to Florida. (Tr. 3.135)

Meanwhile, the civil suit *Gernant, et al. v. Bray, et al.,* moved on with Gurny appearing as Bray's legal representative. By this time, as noted earlier, American Fidelity had abandoned its efforts to jettison its assured and had resigned itself to defend Bray without any formal reservation, consistent with its contractual obligation under the policy.

The Gernant-Bray suit flowed within the normal channels of civil litigation. Interrogatories were propounded by each side. Medical reports were exchanged and pretrial conferences held.

Gurny, as the recipient of the raw pretrial information, transmitted documents and correspondence which he deemed of importance to American Fidelity. (Tr. 2.77–2.79)

Gurny's frequent communications with American Fidelity confirmed the earlier prognosis by Packert "that liability appears to be full." In particular, Gurny's December 22, 1964, letter to American Fidelity, accompanied by plaintiffs' answers to interrogatories, summarized the extent of the injuries asserted against Bray by the accident claimants.[9]

Within the same communication Gurny informed American Fidelity of the following opinion:

There is no question in our mind that if the cases are lost, the verdict will exceed your policy limits.[10]

Gurny repeated his forecast of liability, highlighting Tannerfors' claim, as exceeding Bray's insurance policy limits in his letter to American Fidelity on August 4, 1965:

A review of the answers to these interrogatories leads us to believe that the injuries to this woman [Tannerfors] are very severe and she has medical expenses which exceed $6,500.00. There is no question in our mind that a verdict in her behalf will exceed $10,000.00. Would you please communicate with us upon receipt of this letter.

(P–1–m)

Again, in his letter of October 19, 1965, Gurny advised American Fidelity of the very high exposure facing its assured:

This will confirm our telephone conversation advising you that the exposure in this case exceeds your policy limits of $10,000/$20,000.

We have forwarded to you answers to interrogatories of each of the plaintiffs and a review of them will indicate that the decedent, Raymond Berchtenbreiter, was the owner and driver of the motor vehicle which was stopped to the rear of the defendant, Glahn's, motor vehicle and passengers in the motor vehicle were the plaintiffs, Gernant and Britta Randall.

\* \* \* \* \* \*

We do not know whether [Berchtenbreiter's] allegation of dependency, which must be proved in a death case, can be substantiated by the plaintiff but if it is, a judgment in favor of these plaintiffs will undoubtedly exceed $10,000.

---

9. Gurny noted that the injuries to Tannerfors "appear to be rather serious. The medical expenses of this woman are over $5,000." (P–1–j, p. 2) Tannerfors' attorney supplemented the original answers to interrogatories concerning medical expenses by letter of January 19, 1965. (P–1–l) Gurny relayed this information to American Fidelity.

10. His letter concluded with the disclosure that the Director of Motor Vehicles was made a party to the lawsuit because of the unidentified car found near the accident scene. The presence of the unidentified motorist in the Gernant-Bray lawsuit became more significant as the litigation proceeded.

The plaintiff, Britta Randall, we are informed, is a cripple, will never walk again, presently resides in Sweden and has medical expenses in excess of $5,-000. A verdict in her behalf will *undoubtedly* exceed $10,000.

The plaintiff, Gernant, had a comminuted fracture of the left shoulder. Medical expenses are in the approximate amount of $400.00 and lost wages in the amount of $800.00. The exposure in this case is in the area of $5,000 to $6,000.

This is a case where *the exposure to the assured is very high. The exposure to your company is limited* because of the amount of the policy. Your assured, whom we had occasion to meet in our office and also at the Magistrate's Court at a hearing in order for a determination to be made whether he would be held for the grand jury on a manslaughter charge, does not make a particularly good witness but he has stated in the Magistrate's Court and to the police and to us that his motor vehicle was struck by another unknown motor vehicle while it was in the process of slowing down for the red light on Route 46 and that he remembers nothing further about the accident.

The police have confirmed that another motor vehicle was found several hours later and apparently abandoned with all traces of ownership of the motor vehicle involved. Paint from this motor vehicle was found which appears to be the same color and type of paint which was on the assured's motor vehicle and confirms the assured's story that another motor vehicle was removed.

The Director of Motor Vehicles of the State of New Jersey is a party defendant in this case because of the fact that there is an unknown owner and operator of a motor vehicle involved and if the jury finds that this unknown operator and owner of the car was negligent, the Director of Motor Vehicles, through the Unsatisfied Judgment Fund Board, would have to pay up to $10,000 for each claim.

*This is a case which if lost would undoubtedly cover your entire policy. It cannot be settled for less than the amount of your policy* and for all of the foregoing reasons we believe *you* might wish to try this case.

We may be successful in convincing a jury that the sole cause of the happening of this accident was the owner and operator of the hit-and-run car.

Please confirm in writing to us our authority in this case which is scheduled for trial on February 16, 1966.

Would you please have Dr. Snedecor's bill in the amount of $25.00 paid and send us a copy of your letter to Dr. Snedecor in payment of the bill.

> Very truly yours,
> /s/ Milton Gurny
> MILTON GURNY
> For the Firm

(P–1–n) (Emphasis added)

Despite the "red flags" waved by Gurny's letters, American Fidelity did not send an "excess letter" to Bray, a deviation from its normal operating procedure (Tr. 1.33), and Bray was never given the benefit of any of the information which Gurny provided to the defendant in his letter of October 19, 1965.

Bray, ignorant of his potential liability, was never informed by Gurny of the possibility of liability exceeding his policy limits (Tr. 3.17), and was never alerted to the decision which had been made by the insurance company to try the case because it could not be settled for less than the defendant insurance company's own maximum exposure.

The defendant here, while conceding that no formal notice was given to Bray of the possibility of an excess judgment, notes that Gurny's testimony indicates that Bray was telephonically advised of a potential excess judgment by Gurny about November 25, 1964. (Def. Post-trial brief, p. 29)

Gurny testified, after refreshing his recollection by examination of his oral deposition taken on April 1, 1971, that Bray called Gurny's office from Florida to report his new Florida address, and that during the conversation Gurny tried to obtain Bray's cooperation with the defense of the lawsuit by frightening him with the seriousness of a case in which the verdict could exceed the policy limits. (Tr. 2.149–2.150).

Bray, on the other hand, stated without reservation that he never talked to Gurny on the telephone at any time. (Tr. 3.14) In fact, Bray testified that the telephone call notifying Gurny's office of his new Florida address was made by him from Hackensack, New Jersey, and that the conversation was solely between Gurny's secretary and himself. (Tr. 3.13)

Gurny also testified that during another alleged telephone conversation with Bray in May of 1966, he used the same method of financial coercion to procure Bray's attendance at trial. Bray testified in detail about the method by which he was contacted and requested to attend the 1966 trial, however, and stated that all communications and arrangements for the 1966 trial were made through American Fidelity. (Tr. 3.14–3.16)

Gurny, handicapped by the destruction of his litigation file on the Gernant-Bray suit, pursuant to what was described as normal office procedure (Tr. 2.74), was hesitant and unsure in his testimony on this issue. Bray, on the other hand, responded without hesitation and related specific details about each communication.

Bray's testimony on the communications to obtain his presence at the trial is also supported by notations on an American Fidelity memo, which states in part that Tresh, an independent adjuster employed by American Fidelity, was assigned the task of locating Bray in Florida and making travel arrangements for his attendance at the 1966 trial. (D–26; Tr. 2.38–2.39)

This Court, after hearing both Bray and Gurny, is persuaded that Bray was never told by American Fidelity or by Gurny at any time before the June 1966 trial that the potential liability for injuries caused by the accident, especially those of Tannerfors, would exceed his insurance policy limits. Despite the clear and repeated reports of Gurny to American Fidelity that, if Bray's case were lost, the verdicts would undoubtedly exceed the policy limits, American Fidelity failed to inform its insured of his precarious financial situation. In sum, Bray went to trial with no appreciation of his exposure, no knowledge of why the insurance company had decided to proceed to trial, no indication whether the matter could be settled, and no opportunity to obtain counsel who would be in a position to advise Bray on his own interests, without any obligation to the insurance company as well.

Moreover, unknown to Bray, settlement discussions had occurred between the Tannerfors attorney, Charles Rodgers, and Gurny or one of American Fidelity's claim representatives, at least several months before the trial on liability. (Tr. 4.8)

Rodgers requested the carrier to "throw the policy on the table" to settle the case, in light of the seriousness of Tannerfors' injuries and the huge, inevitable verdicts that the plaintiffs would ultimately recover. American Fidelity's response to his first settlement offer was in the negative. (Tr. 4.8–4.9)

A second attempt by Rodgers to settle the case just before the trial also proved fruitless, because American Fidelity again refused to offer the full policy limits, the only acceptable sum Rodgers would have taken for settlement of his clients' claims.

Despite knowledge of the plaintiffs' potentially huge claims, particularly Tannerfors', against its insured, American Fidelity failed to offer the limits of Bray's insurance policy in settlement of the plaintiffs' claims prior to trial.

Defendant argues that, even if the policy limits were offered in settlement of Tannerfors' accident claim, Tannerfors would not have accepted $10,000.00, the maximum amount payable to a claimant under the policy, in exchange for releasing her cause of action against Bray.

Since he was Tannerfors' attorney for the litigation of her accident claim, the testimony of Rodgers is of prime importance on this issue. He viewed recovery as coming from only two possible sources: Bray's insurance policy or the Unsatisfied Claim and Judgment Fund, with a maximum recovery of $20,000.00 for all claimants or $10,000.00 for an individual claimant, no matter which defendant was found liable. (Tr. 4.51) By his pretrial investigation, Rodgers knew that Bray's assets were negligible and that if Bray were found liable, recovery would be limited to the insurance policy limits. (Tr. 4.9) This fact was confirmed by Gurny. (Tr. 2.129–2.131) In Rodgers' view, a recovery of $10,000.00 was the maximum amount Tannerfors could realistically receive if liability were found against Bray. An identical amount was available from the Unsatisfied Claim and Judgment Fund if liability were assessed against the driver of the phantom car.[11]

It was Rodgers' testimony that had he been offered the $10,000.00 by the insurance company in full settlement of Tannerfors' claim, he would have recommended Tannerfors' acceptance of that amount as the maximum amount available under the circumstances. (Tr. 4.67)

Drawing upon his previous transactions with Tannerfors in the handling of the case, Rodgers had no doubt that his client would have followed whatever advice Hillstrom, Tannerfors' Swedish attorney and the communication link between Tannerfors and Rodgers, presented. Hillstrom had previously obtained Tannerfors' approval of the bifurcation of trial on the issues of liability and damages (P–1–u), and Tannerfors' acceptance of a $10,000.00 settlement, after explanation of the financial limitations on recovery, would undoubtedly have been forthcoming. (Tr. 4.67–4.68, 4.84) In fact, Rodgers was authorized to "try and effect a settlement" on Tannerfors' claim. (P–1–u) Yet, according to his testimony, he never received any offer of settlement for the Tannerfors claim from attorney Gurny until after the trial on liability. (Tr. 4.12) During this pretrial period, Rodgers was informed that American Fidelity was disclaiming liability on Bray's policy. (Tr. 4.43–4.49)

Rodgers transmitted this information to Tannerfors through her Swedish attorney, and advised her that as a practical matter, any recovery on her injury claim would be most likely to come from the Unsatisfied Claim and Judgment Fund, and thus be limited to a maximum of $10,000.00. (P–1–r)

Not until shortly before the trial on liability was Rodgers informed of American Fidelity's decision effectively to concede the validity of Bray's policy. (Tr. 4.53)

It must be noted that Gurny's testimony on the possibility of achieving a settlement of the Tannerfors claim is at odds with Rodgers'.

Gurny testified that meaningful negotiations were never possible (Tr. 2.93); that he was told the case could not be settled for the policy limits (Tr. 2.115); that Rodgers was unable to get a demand from Tannerfors because of the difficulties with his client (Tr. 2.98); that Tannerfors wanted a judgment and not a settlement (Tr. 2.92); and that Rodgers required a judicial determination to apportion the respective shares of his clients and the other claimants in the available proceeds. (Tr. 2.116).

Gurny founded these beliefs upon conversations with Rodgers during the pretrial period. (Tr. 2.92–2.96)

He testified that it was for those reasons that he never computed the poten-

11. *See* N.J.S.A. 39:6–69 (1958).

tial exposure of Bray (Tr. 2.92), nor determined what sum, if any, Bray could contribute to a possible settlement pot. (Tr. 2.94) He asserted the same justification for not offering the policy limits (Tr. 2.127)

The Court, having heard the testimony of both Rodgers and Gurny, finds the fact to be that Rodgers did try to settle the case, that he did, as he said he did, call for the policy limits, and that he would have settled the case and released Bray if the defendant had offered the full $10,000.00 policy. Not only was Rodgers' testimony persuasive, but on the face of the matter nothing else would have made sense in the situation. It would have been an act of futility for the paraplegic Mrs. Tannerfors to have undergone the discomfort and expense of journeying from Sweden to trial in New Jersey, along with her medical experts, in order to get a personal judgment against Bray, a refrigerator maintenance man who suffers from chronic arthritis, and who at the time earned between $4.10 and $4.55 per hour and had $900.00 in his savings account.

By the same token, the Court rejects the testimony of Gurny that he had *determined,* before July 16, 1965, that $10,000.00 would not settle the matter, and that he was never able intelligently to discuss settlement with Rodgers because Rodgers would not negotiate with him. Not only does this Court find Rodgers' account credible and Gurny's not, the Court further finds that Gurny and the responsible agents of the defendant, including Packert, made a deliberate decision not to offer the full policy limit of $10,000.00 precisely because they knew that anything less than that amount could not settle the case, and that anything more than that figure would be Bray's responsibility, not theirs. Those were in fact the very reasons for their determination to try the case, despite their own opinion that it was an almost hopeless cause on liability and that the damages would surely be beyond the policy limits. If, by some off-chance, the case were won, American Fidelity would save itself $10,000.00. On the other hand, if the case were lost, as appeared likely, all American Fidelity could lose was the $10,000.00, all of which would be required to settle in any event, and any excess verdict would be the sole liability of Bray. In sum, American Fidelity elected to gamble, to risk Bray's exposure to a vast verdict in order to preserve some slight chance of extinguishing its own liability. It was a gamble—one in which the insurance company had everything to gain, and Bray had everything to lose.

The Court therefore rejects American Fidelity's position that an offer of the policy limits would have been a futile gesture. It would not have been futile; in any event, it was never made.[12]

Faced with the prospect of a full-scale trial, entailing the expense of producing Tannerfors in New Jersey and obtaining expert medical witnesses on her damages, Rodgers struck upon the concept of bifurcation of the trial on the issues of liability and damages.

---

12. Gurny testified that the Rodgers conversation concerning settlement occurred before July 29, 1965, the date of Rodgers' letter (D–6) to all counsel requesting trial bifurcation of liability and damages. Subsequent correspondence from Gurny to American Fidelity is bereft of any indication that it was impossible to effect a settlement of Tannerfors' claim.

The only reference to settlement in Gurny's October 19, 1965 letter (P–1–n) to American Fidelity states:

This is a case which if lost would undoubtedly cover your entire policy. *It can-*

*not be settled for less than the amount of your policy* and for all of the foregoing reasons we believe you might wish to try this case.

(Emphasis added)

Although Gurny communicated that settlement of the claims could not be effected for *less than the policy limits,* it is apparent that an offer of the *full policy limits* was never contemplated by American Fidelity or Gurny.

In fact, immediately after liability was found against Bray at trial, Gurny tendered the policy limits, less $500.00, to Rodgers. (Tr. 4.14)

He explained the economic facts of life to Tannerfors in his letter of July 28, 1965 (P-1-r), and requested her approval of the bifurcation. The next day he broached the same subject to all counsel in his letter of July 29, 1965 (D-6), setting forth the economic hardships faced by his client.

Rodgers, still under the belief that American Fidelity had disclaimed coverage under Bray's policy, emphasized in both communications that the maximum amount Tannerfors could expect to receive was $10,000.00, and that producing his client for medical examinations in this country would be a great inconvenience.

Gurny, convinced of the authenticity and seriousness of Tannerfors' injuries because of his previous association with one of her treating physicians (Tr. 2.119–2.122), determined that the issue of liability was the only issue of concern in Bray's defense.

All counsel acquiesced to the bifurcation. Rodgers reported to Tannerfors that her presence was not required for the trial. (P-1-t)

As the date for the June 1966 trial approached, American Fidelity, through the efforts of its Florida representative, located Bray and arranged for him to attend the trial. Bray, still laboring under the impression that his presence in the suit was nominal, attended the trial for two days. (Tr. 3.64)

Gurny never discussed the case with Bray outside the courtroom, nor did he discuss it with him before placing him on the stand, and when Bray finished testifying, Gurny instructed him to "go home and forget about it." (Tr. 3.66–3.67)

The jury rejected Gurny's theory that the proximate cause of the accident was the phantom automobile, and found liability exclusively against Bray.

A trial date of June 29, 1966 was set on the issue of damages before the Superior Court judge without a jury. At the commencement of the damages trial, Gurny finally offered the full policy in settlement of the claims. (D-7) But by this time, and largely for other reasons, Rodgers had decided to decline the offer, and the trial on damages proceeded in the absence and without the knowledge of Bray, who had been sent home with the advice to forget about it.

Rodgers recognized throughout the litigation that Tannerfors' injuries were so severe that both the most and the least she could recover if there was coverage of $10,000/$20,000 was $10,000.00. (Tr. 4.65, 4.67, 4.75) However, he realized that a judicial apportionment among the other four injured parties, Gernant, Berchtenbreiter, Glahn and Cooper, would be required no matter what recovery was achieved.

The potentially equal claims for damages, although small in comparison to Tannerfors', required a judicial apportionment to determine their participation in the distribution of the other $10,000.00.

Thus, although Gurny offered the full policy at the commencement of the trial on damages in settlement of all claims, Rodgers could not settle the Tannerfors claim for $10,000.00 without specific authorization from his client in Sweden. Rodgers felt that as long as he was putting the Gernant and Berchtenbreiter damage issues before the trial judge, he might as well put Tannerfors' damages before the court for determination. (Tr. 4.105)

The trial on damages consisted of the testimony of one physician and the submission of the hospital records of the injured parties. (P-1-u) Gurny, convinced that Tannerfors' injuries were legitimate and valued at more than $10,-000.00 (Tr. 2.120–2.121), did not object to the introduction of the hospital records despite the fact that they were almost two years old. (Tr. 2.144) He had taken no steps to have Tannerfors examined by his own experts, nor had he sought to ascertain her current physical condition.

The trial judge awarded damages for personal injury to Gernant in the sum of

$9,000.00, the Berchtenbreiter administrator in the sum of $10,000.00, Frances Cooper in the sum of $500.00, Harry Glahn in the sum of $500.00, and Tannerfors in the sum of $75,000.00. (P–1–u)

The proceeds of the Bray insurance policy were apportioned among the claimants. Tannerfors received $10,000.00, the maximum amount available under the policy limits, in partial satisfaction of her claims. (D–8) The other claimants received their proportional amounts from the remaining $10,000.00. (Tr. 4.64)

Bray, now back in Florida and ignorant from the outset of his potential liability in the suit, was never informed of the final judgments entered against him. (Tr. 3.18)

It was not until he received a phone call from Tannerfors' present attorney, in the early summer of 1971, that Bray realized a judgment of $75,000.00 had been entered against him in the New Jersey auto accident lawsuit. (Tr. 3.19, 3.39)

Tannerfors' present attorney explained to Bray that, if Bray assigned to Tannerfors his right to sue American Fidelity for the excess judgment, Tannerfors would release him from that judgment. (Tr. 3.39)

On June 15, 1971, Tannerfors' attorney sent such an assignment form for Bray's execution (P–1–p) and a covering letter (P–1–q) confirming the previous telephone conversation.

Bray did not sign the assignment. On August 27, 1971, Bray was approached by Jack Nix, acting on behalf of Tannerfors, with another assignment for execution. Nix again explained to Bray that the purpose of the assignment was to relieve Bray of financial responsibility arising out of the Tannerfors judgment. (Tr. 3.24) Bray executed the assignment (P–1–p) after Nix's explanation of the purpose of the document on August 27, 1971. By this action he relieved himself of the burden of the judgment which had been filed against him.

■■ Defendant American Fidelity contends that the assignment was invalid for lack of consideration, mistake of fact, and subsequent revocation by Bray. Under *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1940), a federal court sitting in diversity must apply the conflicts principles of the forum state. Both parties agree that under New Jersey conflicts laws, this Court should apply the substantive law of Florida, the place of execution of the assignment, in determining its validity. The Court agrees. *See Freedom Finance v. New Jersey Bell Telephone Co.,* 123 N.J.Super. 255, 302 A.2d 184 (L.Div.1973).

The crux of defendant's attack upon the assignment is that Bray misunderstood the nature and purpose of the assignment. The Court disagrees.

Understandably, Bray might have been perplexed when Tannerfors' attorney first offered to release Bray from liability under Tannerfors' judgment in exchange for an assignment of his rights against the defendant. However, it must also be remembered that Bray had no knowledge that he had any liability under any judgment at that juncture.

This Court is convinced that at the time he executed the assignment, Bray realized he was being released of financial responsibility under the Tannerfors judgment in exchange for authorizing Tannerfors to sue on his insurance policy. (Tr. 3.79–3.80)

■ Tannerfors' forebearance in asserting her legal rights against Bray under the New Jersey judgment is sufficient consideration to support an assignment of Bray's contractual rights under his insurance policy. *Cf. McNulty v. Nationwide,* 221 So.2d 208 (Fla.App. 1969); *Selfridge v. Allstate,* 219 So.2d 127 (Fla.App.1969). The fact that Bray did not receive a written document memorializing Tannerfors' release of the judgment does not invalidate Bray's assignment of his cause of action:

It is well settled that parol evidence is admissible to establish the actual

consideration supporting a written contract of the nature here asserted. It is also well settled that parol evidence is available to connect several written instruments as being parts of one transaction. [citations omitted] If it be a fact, as alleged, that the formal release given . . . was for a consideration in addition to that recited therein, it is competent, consistent with other rules of evidence, to establish such a parol testimony.

*Asphalt Paving Inc. v. Ulery,* 149 So.2d 370, 377 (Fla.1963).

Bray's testimony establishes that he understood that his execution of the assignment was in exchange for a release of financial responsibility under the Tannerfors judgment. (Tr. 3.79) Each party received consideration in the contractual bargain, and each party is bound to its contractual obligations. Defendant's assertions of lack of consideration and mistake of fact in relation to the assignment are thus misapplied, assuming, without deciding, that American Fidelity has standing to raise either of these two issues as to the assignment from Bray to Tannerfors.

Defendant next claims that even if the initial assignment from Bray to Tannerfors was valid, Bray later revoked the assignment of his rights under the insurance policy, and therefore plaintiff has since lost whatever rights she received under the initial assignment. The factual history of the revocation is significant in this regard.

On April 11, 1974, Claire Tomlin, a representative of American Fidelity, called on Bray at his home in Pace, Florida. Tomlin informed Bray that the assignment (P–1–p) which he had earlier executed had failed to release him of liability under Tannerfors' judgment. (Tr. 3.128–3.130) Tomlin presented Bray with two different forms for revocation of Tannerfors' assignment. (D–15 and D–17) Bray, in reliance on Tomlin's misrepresentations and believing that Tannerfors had deceived him and that he had not been released from li-

ability for the judgment, executed both documents.

The defendant was not yet satisfied with having procured the April 11, 1974 revocations. On June 13, 1974, Claire Tomlin journeyed again to Bray's home to secure yet another affidavit, which purported to affirm the previous revocation of the assignment of his rights under the policy. (D–16) Bray executed this third document as well. The real purpose of the new affidavit, however, was to get Bray to swear to the allegations in paragraphs 6, 7, 8 and 9, which had nothing to do with the initial assignments.

It is noteworthy that the third document (D–16) was in affidavit form, and that before signing this document, Bray crossed out paragraphs 6, 7, 8 and 9:

6. I was advised by my insurance company and the attorney assigned to represent me, that the amount which was being claimed by Britta Randall was in excess of my insurance coverage.

7. I was also advised that should there be a Judgment of liability against me that the verdict regarding damages in favor of Britta Randall would clearly exceed the amount of my insurance coverage.

8. I was also advised that if I were found liable and if a Judgment was rendered which was in excess of the $10,000.00 coverage afforded to me by my policy, then I would be personally responsible for the excess over and above the policy limits.

9. Realizing and understanding the situation that confronted me, I was of the firm opinion that I was not liable and believed the case should be tried and advised the insurance carrier and the attorney of my decision to try the case.

These four paragraphs were and are a bold attempt to provide the defendant with a defense to the very claim now before this Court, the claim that the defendant breached its fiduciary duty to Bray. Moreover, these four paragraphs

represent nothing less than the manufacturing of that defense, particularly in paragraph 9, where Tomlin sought to have Bray swear that, with *full knowledge* of his own potential liability, he had instructed the insurance carrier and the attorney that *he* wanted the case tried. Not even Gurny testified to receiving such instructions from Bray, nor did Packert, nor did anyone else from American Fidelity.

Bray, even in executing this third revocation of assignment, still believing that he had been deceived by Tannerfors, nevertheless refused to endorse these four paragraphs.

Bray testified that he signed these documents only because of Tomlin's representation that Tannerfors had not released him from his judgment liability. (Tr. 3.128–3.129)

■ This Court finds that Bray acted under a mistake of fact, intentionally caused by the misrepresentation of defendant's agent, when he signed the three documents purporting to revoke the bargained-for assignment to Tannerfors. This defendant will not be permitted to profit from its own unconscionable conduct. Indeed, if there be any failure of consideration here, it is not a failure of consideration for the assignment from Bray to Tannerfors, which secured for Bray a release of liability for a $65,000.00 judgment; it is, rather, a failure of consideration for the Bray revocation, solicited by the defendant insurance company for its benefit alone, and to the great detriment of its assured. The validity of the assignment thus remains intact, despite the fraudulent efforts of the defendant to strip Bray of his release and to fasten liability yet again upon him.

The nature of the relationship between an insurance company and its insured in the handling of a claim is predicated upon the terms of the policy:

> By virtue of the terms of such a policy, proscribing the insured from settling in his own behalf, the carrier has made itself the agent of the insured

in this respect. *Fidelity & Cas. Co. v. Robb,* 267 F.2d 473, 476 (5th Cir. 1959). Thus the relationship of the company to its insured regarding settlement is one of *inherent fiduciary obligation.*

*Rova Farms, supra,* 65 N.J. at 492, 323 A.2d at 505. (Emphasis added)

The standard of conduct imposed upon the carrier in its fiduciary relationship is one of good faith and fair dealing with its insured's interests in mind. *Radio Taxi Service, Inc. v. Lincoln Mutual Ins. Co.,* 31 N.J. 299, 157 A.2d 319 (1960); *Bowers v. Camden Fire Ins. Assoc.,* 51 N.J. 62, 237 A.2d 857 (1968).

The determination of whether a carrier has acted in good faith and dealt fairly, honestly and candidly with its insured in the handling of a claim is guided by an examination of the particular factual circumstances of each case, subject to certain basic principles.

As this Court stated in *Kaudern v. Allstate Ins. Co.,* 277 F.Supp. 83, 88 (D.N.J.1967), adopting the following statement in *Bell v. Commercial Ins. Co.,* 280 F.2d 514 (3rd Cir. 1960):

> The view taken is that the insurer must accord the interest of its insured the same faithful consideration it gives its own interest: since the interest of one or the other may be imperiled at the instant of decision, the fairest method of balancing the interest is for the insurer to treat the claim as if it were alone liable for the entire amount.

This is particularly true when there is a possibility that the verdict will exceed the policy limits:

> When it is probable that an adverse verdict will exceed the policy limit, the propriety of an insurer's refusal to accept a settlement offer which is within the coverage requires a resolution of conflicting interests. In our judgment, in view of the duty of the insurer to act in good faith, the resolution can lead to but one fair result: both interests can be served justly only if the insurer treats any settle-

ment offer as if it had full coverage for whatever verdict might be recovered, regardless of policy limits, and makes its decision to settle or to go to trial on that basis.

*Bowers v. Camden Fire Ins. Assoc.*, 51 N.J. 62, 237 A.2d 857 (1968).

And as stated in *Rova Farms, supra*, 65 N.J. at 493, 323 A.2d at 505:

[W]here, as in the present case, any adverse verdict at trial is likely to exceed the policy limit, the boundaries of good faith become more compressed in favor of the insured, and the carrier can justly serve its interests and those of its insured only by treating the claim as if it alone might be liable for any verdict which may be recovered.

This is not to say that a carrier is strictly liable for any excess liability over an insured's policy limits whenever it refuses to settle.

Instead, a carrier's decision not to settle

. . . must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company. This expertise must be applied, in a given case, to a consideration of *all the factors* bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial . . . [A]nd as to liability, the question is not whether the carrier, its attorney, or the insured considers a defendant liable but what the jury

would be justified in finding from the evidence available and adduced.

*Rova Farms, supra,* at p. 490, 323 A.2d at p. 503.

■ An insurer, having contractually restricted the independent negotiating power of its insured, also has an affirmative duty to take the initiative in settlement negotiations and to attempt to procure a settlement within the policy limits:

Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingness of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available.

*Young v. American Cas. Co. of Reading, Pa.,* 416 F.2d 906, 911 (2nd Cir. 1969), *petition for cert. dismissed,* 396 U.S. 997, 90 S.Ct. 580, 24 L.Ed.2d 490 (1969).

■ Even an insurer's receipt of an offer of settlement in excess of the coverage of its policy does not abrogate the fiduciary duty it owes to its insured in the settlement area.

Under such circumstances, the insurer acts in bad faith unless it attempts to engage the insured plaintiff's counsel in negotiations to reduce the initial settlement demand and discloses to its insured the opportunity to settle. *Yeomans v. Allstate Ins. Co.,* 121 N.J.Super. 96, 102, 296 A.2d 96 (Cty.Ct.1972), *aff'd.* 130 N.J.Super. 48, 324 A.2d 906 (App. Div.1974).

The initial demand by a personal injury plaintiff usually will mark the upside limit of settlement negotiations:

It is a matter of common knowledge that it is a rare case where exploration of the possibilities of settlement, beyond the mere receipt of the plain-

tiff's demand, will not result in some substantial reduction of the amount.

\* \* \* \* \* \*

To require the insured to establish his willingness to contribute toward a settlement presupposes a settlement figure toward which contribution may be made. The personal injury plaintiff's initial demand is not the settlement figure against which proof of an insured's willingness to contribute should be measured. Had the insurer attempted to fulfill its responsibility by preliminary negotiations of the initial demand figure, the resultant settlement might well have been within the policy limits or, at worst, within the ability of the insured to make sufficient contribution to effect a settlement. Any doubt which admittedly exists in speculating on these possibilities should be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates that not only was there no realistic possibility of settlement within the policy limits, but also that the insured would not have contributed to whatever settlement figure could have been obtained.

*Id.* 121 N.J.Super. at 103, 296 A.2d at 99, citing *Young v. American Cas. Co. of Reading, Pa., supra,* 416 F.2d at 910–911.

█ Application of these standards to the facts of this case clearly justifies a finding that the defendant breached its obligation to its insured, George Bray, in virtually every aspect of its handling of the claim of Britta Randall Tannerfors.

Throughout the history of American Fidelity's handling of the Tannerfors' claim, the defendant's actions were bent upon achieving only one goal, escaping its own liability, whatever the consequences to its assured.

Instead of initiating negotiations to settle the claim within the coverage of the policy, American Fidelity erected a barrier to settlement negotiations by refusing to tender the policy limits when requested.

The company may protect itself against excess liability, where the settlement value of the claim is recognized as being in excess of the policy limits by making an offer to settle for the maximum sum within the policy limits, or by advising insured of continuing willingness to pay such sum at any time that the claim can be settled for that sum or for that sum plus whatever the insured is willing to add. [Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv. L.Rev. 1136, 1148 (1954)].

*Rova Farms, supra,* 65 N.J. at 494, 323 A.2d at 506.

There can be no doubt that American Fidelity was aware that potential liability exceeded the policy limits. The record is replete with proof of this fact.

Under such circumstances, the insurer in its fiduciary role was bound to consider itself potentially liable for the entire amount of any judgment, and to offer the policy limits even if no demand had been made by the insured's claimant. Here, of course, the demand was made.

Whether or not a judicial determination was needed by the claimants for apportionment of whatever recovery was forthcoming has no bearing on American Fidelity's failure to conform to the fiduciary duty it owed to its insured. If a judicial assessment were necessary among the claimants, Bray's presence at the apportionment proceeding would have been truly nominal only if the claims were settled and releases obtained by American Fidelity on Bray's behalf. Just as the New Jersey courts have dispensed with similar contentions as frivolous, *Bowers v. Camden Fire Insurance Assoc.,* 51 N.J. 62, 77, 237 A.2d 857 (1968), this Court must also reject defendant's contention on this issue as baseless.

By far the most outrageous breach of the inherent fiduciary duty imposed on defendant by the policy was the failure to apprise Bray of the awesome poten-

tial liability that he faced as a result of the claimants' lawsuit, particularly with regard to the Tannerfors claim.

From the very first day that the defendant received news of the involvement of its insured in an automobile accident, it was bent on insulating itself, not its insured, from liability. While it is understandable that an insurer would seek to determine why a policy insuring a New Jersey resident had been written through a Florida agent, American Fidelity and its attorney were in reality embarked not upon a campaign to determine the legality of Bray's insurance policy, but solely to secure the defendant company from any liability, however small in relation to Bray's exposure beyond the policy limits. It was with this purpose that defendant engaged a New Jersey attorney, Gurny (Ex. P–1–c), and it was with this purpose that Gurny interrogated Bray at their first meeting on August 11, 1964 (P–1–e). As with all of Bray's encounters with Gurny, Bray was never told of his potential liability, despite the fact that within six weeks of the accident the defendant's employees had characterized its liability under the policy "to be probable, to full." (P–1–a)

Bray was never informed of the potential financial risk he faced, even after his departure from the witness stand at the June 1966 trial. In fact he was never advised of the ultimate outcome of the case, a judgment against him in excess of $95,000.00, until almost five years after that judgment was entered. The only concern that American Fidelity manifested toward Bray was to shuttle him from Florida to New Jersey for the liability trial in order to enhance its possibilities of success "in convincing a jury that the sole cause of the happening of [the] accident was the owner and operator of the hit-and-run [phantom] car" (P–1–n), and escape liability on its policy.

American Fidelity disregarded the realities recognized by the New Jersey Supreme Court:

> There was always, in fact and in law, a conflict of interest between [the insurer] and its insured from the time it realized the gravity of [the claimants'] awful injury and recognized that its insured must one day confront a jury, unspared from such ordeal by legal control by the trial court and vulnerable, under the most simplistic view of the probabilities, to an excess verdict far beyond the policy limit. These factors projected immediately the most urgent duty to act in good faith and with diligence in attempting to arrange a possible settlement, including the policy limit, even if something had to be added by [the insured].

*Rova Farms, supra,* 65 N.J. at 492, 323 A.2d at 504.

Although it can be argued that American Fidelity "spared" Bray the ordeal of confronting a jury which would contemplate an excess verdict beyond his policy limits, it never even contemplated a possible settlement, to the *full* limits of the policy, with the possibility that Bray could contribute additional consideration to effect the agreement. The simple fact remains that the claimants, particularly Tannerfors whom the defendants knew to have the largest claim (P–1–n), would have settled for the policy limits without any future contribution by Bray.[13]

The circumstances of this case reveal that the defendant acted in such total disregard of the interests of its insured as to constitute plain bad faith. Its failure to meet its fiduciary responsibilities must necessarily result in

---

13. Although this Court finds that Bray could not have made any significant contribution to the settlement "pot" from his contemporary assets at any time during the pretrial period, it does find that he would have undertaken whatever action he could to contribute to the settlement, whether by loans at the time or by promissory notes payable to the claimants, in order to keep from having to live with a judgment hanging over his head for the rest of his life. (Tr. 3.146–3.150, 3.167–3.170).

its own shouldering of the excess liability that its fiduciary breach had imposed Bray.

The Court must state that the activities of the insurance company, its agent Packert and its counsel Gurny, both of whom are attorneys, are from the first to the last repugnant to this Court's concepts of fair dealing and fundamental honesty, to say nothing of professional and fiduciary responsibility. From the first to the last this defendant and these two lawyers exhibited nothing but the most callous disregard for the interests of Bray, and readily and repeatedly subverted his interests whenever, in their judgment, his interests diverged in the slightest degree from those of the insurance company.

As the Court has observed, their initial reaction of seeking a method to disclaim liability, immediately after learning of the catastrophic accident which appeared likely to have been caused by their insured, was not itself improper under the circumstances. The methods they selected, however, are quite another matter. The first meeting and interview between Gurny and Bray presented nothing less than the spectacle of a sophisticated attorney exploiting an unschooled layman who trusted him, in the mistaken belief that the attorney was his own and was acting in his own best interests, and not against them.

The second step, once Gurny and Packert had decided not to sue Bray but instead to "represent" him, and their gamble in favor of American Fidelity's interests and against his, has already been dealt with in full.

The third stage, however, is the most shocking of all. Having first attempted to build a case against Bray, and having

failed in that, then having misrepresented him in such a way as to fasten a large and unnecessary judgment upon him, American Fidelity, upon learning that Bray had succeeded in escaping that liability by assigning his rights to Tannerfors, utilized the most brazen misrepresentations in an attempt for its own advantage to throw that substantial liability back upon its former assured, by causing him thrice to renounce the very assignment by which he had ultimately freed himself of the liability his putative "representative" had caused him.

Lastly, the Court turns to the issue of the judgment to be awarded to Tannerfors.

In *Rova Farms,* the Court reasoned that the insurance carrier, who wrongfully breached the fiduciary obligation imposed by virtue of its policy, was liable to its insured for any sum which its insured was required to pay in satisfaction of the judgment caused the insured by the carrier's malfeasance. 65 N.J. at 504, 323 A.2d 495.

In the instant case, Bray satisfied Tannerfors' judgment not by a cash payment but rather by an assignment to Tannerfors of the rights arising from his insurance policy with the defendant.

Realistically, the value of the judgment, as of August 27, 1971, is the amount Bray exchanged for the release of Tannerfors' judgment on that date.[14]

At the time of Bray's assignment, only $10,000.00 of the $75,000.00 had been satisfied. The judgment therefore was worth $65,000.00 plus accrued interest up to August 27, 1971, the date of Bray's assignment and Tannerfors' release. Accordingly, judgment will be entered in favor of plaintiff and against the defendant in that amount.

---

14. Prejudgment interest is inappropriate under the doctrine of *Rova Farms, supra.* There is no evidence that Bray incurred a direct monetary loss or interest expenditures when he satisfied the excess judgment occasioned by American Fidelity's breach of fiduciary obligations.

Just as Bray is not entitled to prejudgment interest on a compensatory basis because he cannot show a paid premium for any money paid in satisfaction of Tannerfors' judgment, plaintiff must accept the cause of action as assigned.

This opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The plaintiff is requested to submit an appropriate form of judgment, on notice, within ten (10) days.

The Clerk of the Court will file a copy of this opinion and judgment with the Central Ethics Committee of the New Jersey Supreme Court, and with the Commissioners of Insurance of New Jersey, New York and Florida. Costs, including the cost of trial transcript pursuant to General Rule 23 of the United States District Court for the District of New Jersey, are assessed against the Defendant.